551 A.2d 1057

**Dieter SIEVERS, Appellant**

v.

**COMMONWEALTH of Pennsylvania, UNEMPLOYMENT COMPENSATION BOARD OF REVIEW.**

Supreme Court of Pennsylvania.

Argued Dec. 8, 1988.

Decided Jan. 6, 1989.

Reargument Denied March 17, 1989.*

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and STOUT, JJ.

## ORDER

PER CURIAM:

ORDER AFFIRMED.

PAPADAKOS, J., filed a dissenting opinion in which LARSEN and STOUT, JJ., joined.

PAPADAKOS, Justice, dissenting.

I must dissent from the per curiam affirmance entered by the Court this date. Appellant's employment was terminated as a result of the fact that Appellant accepted an employer-designed "voluntary" termination plan rather

* Larsen and Papadakos, JJ., dissent and would grant reargument.

than risk an involuntary layoff. He was subsequently denied unemployment benefits.

Appellant worked as a maintenance foreman for Nabisco Brands, Inc. He had been with the company for over seventeen years at the time of his separation from employment on October 31, 1985. The termination of Appellant's employment came about through a plan euphemistically titled "operation leveraging and streamlining" ("OLS") which was offered unilaterally to all management employees by Nabisco. Nabisco established this plan in order to avoid mandatory layoffs of salaried personnel such as the claimant.

The particulars of the reduction plan at issue are that in April, 1985, all management personnel were notified that in order for the company to remain competitive, the company would have to reduce its number of salaried employees by thirty (30%) percent nationwide. In order to avoid becoming uncompetitive, the company offered individualized severance packages to those who would relinquish their employment "voluntarily." Had this program not produced the required staff reduction, it was asserted that layoffs would have followed. Rather than risk layoff, Appellant accepted Nabisco's offer to resign under the OLS plan.

As it turned out, more people accepted the OLS plan than was necessary to ease Nabisco's financial dilemma. Neither Appellant nor any of the other individuals who accepted the plan was advised of this. The agreement, once effectuated, was not revocable. Thus, even if such knowledge would have led Appellant or his co-workers to reconsider their decision, it came too late for them to retract their separation agreements.

Under these circumstances, Appellant was subsequently denied unemployment compensation on the theory that he had left his employment voluntarily, and the Commonwealth Court affirmed that determination. I believe that, as a matter of law, Appellant's termination here was not voluntary under our Unemployment Compensation statute. Moreover, the Commonwealth Court's decision to the con-

trary may have a wide-scale detrimental effect on persons currently in the workforce who are subject to this sort of enticement and whom the statute is designed to protect.

If this Appellant had not "voluntarily" signed up for the termination plan at issue, he would have remained in the general pool of employees, 30% of whom would have had to have been laid off or terminated. Or so he was led to believe. Rather than risk the layoff, Appellant signed up for the plan. As it turned out, more than 30% of its employees accepted the employer's plan. Hence, no one was, in fact, laid off and Appellant alleges that *he was the only person denied* unemployment compensation. All others who accepted this termination plan and applied for unemployment compensation were paid appropriate benefits.[1] (N.T. at 13).

This is like being asked to "volunteer" for hazardous duty with the threat that if enough volunteers are not forthcoming, three out of every 10 will be summarily shot. This is hardly voluntary in the sense meant by the statute. It is voluntary only in the sense that literal physical compulsion has not been employed.

In *Warner Co. v. Unemployment Compensation Board of Review*, 396 Pa. 545, 153 A.2d 906 (1959), this Court rejected the argument that the terms of a collective bargaining agreement permitting an employer to discharge employees at the age of 68 constructively made Appellant Gianfelice's discharge in that case voluntary. Mr. Justice Cohen stated:

Moreover, we believe that the labor-management agreement cannot govern our determination in this case for another reason. The Unemployment Compensation Law was enacted to alleviate the hardships attendant upon unemployment.... It is a remedial statute designed to provide support for workers who are unemployed except

1. Something is fundamentally unfair in such treatment, if true, and I call upon the Unemployment Compensation Board of Review to re-examine its procedures and institute appropriate safeguards to prevent such contradictory results.

for those disqualified by one of the specific provisions of Section 402. [43 P.S. § 802.] ... In furtherance of this policy, the General Assembly included Section 701, 43 P.S. § 861, in the law. This provision renders invalid any agreement by an employee to waive or release any of his rights under the act. It is our view that if the labor-management agreement were able to be relied upon to disqualify Gianfelice as a "voluntary quit" when his separation from work was not in fact voluntary, the agreement would be invalid to such extent.

Support for the conclusion that a statutorily-expressed public policy cannot be modified by private agreement is readily found in analogous situations....

Where a statute of the Commonwealth expresses a public policy designed to alleviate a condition of possible distress among the public or a segment thereof and *explicitly proscribes waiver of the benefits of the act,* no private agreement, however valid between the parties, can operate as such a waiver. Here, the provisions of the agreement under which Gianfelice had to retire, while legitimate conditions of employment and binding between Gianfelice and the Warner Company, cannot thwart a clearly-expressed state statute under which Gianfelice is entitled to benefits.

153 A.2d at 906–907 (footnote omitted.)

Appellant has not expressly argued that his employer forced him, in effect, to waive compensation under 43 P.S. § 861, but the analogy is apt.

In 1980, the legislature modified Section 402(b) of the Unemployment Compensation Statute, 43 P.S. § 802(b), to include the following provision:

An employee shall be ineligible for compensation for any week—

.    .    .    .    .

(b) In which his unemployment is due to voluntarily leaving work without cause of a necessitous and compelling nature.... *Provided ... [t]hat no otherwise eligible claimant shall be denied benefits for any week in*

*which* his unemployment is due to exercising the *option of accepting a layoff, from an available position pursuant to a labor-management contract agreement, or pursuant to an established employer plan, program or policy.* (Emphasis added to identify amendment.)

It takes no great leap in logic to conclude that Appellant here exercised the option of accepting a layoff under an established employer plan, program or policy. The layoff was permanent, of course, and was induced not by the prospect of certain termination, but by the prospect of being forced to play the employer's version of Russian roulette (with a 30% chance of being "hit".)

Section 402(b) of the statute, 43 P.S. § 802(b), also expressly provides that the forced resignation from a union (or the forced joining of a union) in order to be eligible for another position that is offered within the employer's company does not make an otherwise involuntary termination voluntary. See, *Pennsylvania Electric Co. v. Commonwealth, Unemployment Compensation Board of Review,* 69 Pa.Commonwealth Ct. 214, 450 A.2d 779 (1982). The underlying policy expressed here is clear and relevant to this case. It prevents an employer from effectively conditioning future unemployment benefits upon an unfair and onerous choice that must be made by an employee.

I fear that if Commonwealth Court's opinion in this case is allowed to stand, it will encourage sophisticated schemes whereby many employers will adopt some variant of what Nabisco did here to force early retirements or "voluntary" layoffs. The temptation to do this will be especially great in periods when an employer faces a financial downturn, or when the bulk of its employees become older and achieve higher wage benefits. To deny unemployment compensation benefits to employees caught in such circumstances seems to me to be contrary to the most fundamental goals of the statute. Nor should we be concerned that this employee will receive double benefits—unemployment compensation and severance pay. One offsets the other and

only the balance, if any, is paid to the terminated employee. See, 43 P.S. § 804.

This Dissent joined by Justice LARSEN and Justice STOUT.