**PECO ENERGY COMPANY, Petitioner,**

**v.**

**UNEMPLOYMENT COMPENSATION BOARD OF REVIEW, Respondent (8 Cases).**

Commonwealth Court of Pennsylvania.

Argued June 11, 1996.
Decided Aug. 16, 1996.

---

Roslyn G. Pollack, Philadelphia, for Petitioner.

Maribeth Wilt–Seibert, Assistant Counsel, Harrisburg, for Respondent.

Before COLINS, President Judge, LEADBETTER, J., and LORD, Senior Judge.

LEADBETTER, Judge.

PECO Energy Company (PECO) petitions for review of the Orders of the Unemployment Compensation Board of Review which,

in six cases[1], affirmed referees' decisions granting benefits under the Unemployment Compensation Law,[2] and, in a seventh case[3], reversed a referee's decision denying benefits. These petitions were consolidated for argument.[4]

These cases arise as a part of a program of reorganization and downsizing by PECO, pursuant to which PECO offered its employees the option of selecting a voluntary separation plan with enhanced severance benefits or an enhanced early retirement plan.[5] These plans were announced by PECO in mid-April 1994. All employees were given an election form to be completed between July 5, 1994 and September 16, 1994, pursuant to which they were to select one of three options: 1) the voluntary separation plan; 2) the early retirement plan; or 3) to remain employed with PECO. The form also specifically provided that after it was submitted, an employee would be given a seven (7) day period in which to revoke his or her election and that, after this seven day period passed, no change of election would be permitted.[6]

These seven claimants all elected to accept either the early retirement plan or the voluntary separation plan. None exercised his right to revoke his selection within seven days, and each was assigned a final release date of December 30, 1994. The Board concluded that prior to December 30, however, each of the claimants made some attempt to revoke the decision to accept the early retirement or voluntary separation plans or to postpone the final release date. When these efforts proved unsuccessful, the claimants all applied for and were granted unemployment compensation benefits. With respect to each individual claimant, the Unemployment Compensation Board of Review made the following relevant findings of fact:

### Claimant Thomas

Claimant Thomas was a claims adjuster in PECO's legal department. On September 16, 1994, Thomas elected to take the voluntary separation plan based upon his belief that his department would be either downsized or outsourced. On December 2, 1994, Thomas learned that the legal department would be neither downsized nor outsourced and that PECO would be hiring replacements to take the place of those in the department who had elected to take the voluntary separation or early retirement plans. Thereafter, before his position was either filled or posted, Thomas attempted to withdraw his resignation. PECO refused.

### Claimant Mattioni

Claimant Mattioni was an estimator/designer in PECO's electric operations department. On August 11, 1994, Mattioni elected to take the early retirement plan because he felt that his job was in jeopardy. Approximately three weeks later, before the September 16 election cut-off, Mattioni went to his supervisor and asked if he could revoke his election. He was informed that, because he did not act within the seven day period following his election, he would not be permitted to revoke his acceptance of the early retirement plan. Had Mattioni not elected to accept early retirement, he could have continued to work for PECO.

1. Robert A. Thomas (Thomas), Barry L. Stahl (Stahl), Gilmore Barclift, Jr. (Barclift), Dominick L. Mattioni (Mattioni), Angelo L. Suarez (Suarez), and Thomas D. Rath (Rath).

2. Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 751/ § 914.

3. Annette Carter–King (Carter–King).

4. Two other petitions for review were also consolidated in this group of cases. However, case No. 2149 C.D.1995 (Charles V. Keely) was remanded to the Unemployment Compensation Board of Review at the request of the parties and case No. 2556 C.D.1995 (William T. Bealer, Jr.) was withdrawn by PECO.

5. The early retirement option was offered to employees who had at least five years of service with PECO and who would reach the age of 50 by December 31, 1995.

6. Employees who elected to accept either the early retirement plan or voluntary separation plan were also required to sign a waiver and release of claims form, pursuant to which they would waive any right to future opportunities within the company and agree not to seek reemployment with PECO following separation. (R.654a–655a).

*Claimant Suarez*

Claimant Suarez was employed by PECO as a maintenance electrician in its Oregon shops division. Suarez accepted the voluntary separation plan on September 13, 1994. He accepted the plan because the company was going through major changes and he was unsure of his future job security. About two weeks prior to his release date in December of 1994, Suarez approached the manager of his division and asked to revoke his resignation. He was informed that he could not do so because it might encourage other employees to revoke their resignations.

*Claimant Stahl*

Claimant Stahl worked for PECO as an operations foreman. He accepted the early retirement plan on September 14, 1994 because he didn't know if he was going to have a job in the future. In late September 1994, however, Stahl heard that an unexpectedly high number of employees had accepted the early retirement or voluntary separation packages offered by PECO.[7] Upon learning of this, Stahl attempted to revoke his resignation by volunteering to remain employed as long as PECO wanted him to stay.

*Claimant Barclift*

Claimant Barclift was employed by PECO as a senior customer service representative in the customer operations department. On August 25, 1994, Barclift elected to accept the early retirement plan after he failed a test which was required to remain employed in his department.[8] Subsequently, Barclift was approached by PECO in November 1994 and asked to extend his employment with the company for nine months until September 30, 1995. Barclift agreed, but in December 1994, PECO rescinded the extension and informed Barclift that he would have to terminate employment on his original release date of December 30, 1994.

*Claimant Carter–King*

Claimant Carter–King was employed by PECO as a customer service representative. When she was informed on July 5, 1994, that she would be required to take a test in order to maintain her position, Carter–King elected to accept the early retirement plan because she feared that she might lose her job if she did not do well on the test. On November 1, 1994, PECO approached Carter–King and asked her to extend her retirement date until September 30, 1995. Carter–King agreed to the extension, but, on December 8, 1994, PECO informed her that it was revoking the offer of extended employment and requiring her to retire on her original release date of December 30, 1994.

*Claimant Rath*

Claimant Rath was employed by PECO as a first level supervisor at its Eddystone Generating Station. On June 17, 1994, he wrote a memo to the manager of the Eddystone Generating Station requesting a six month extension if he elected to retire early. This memo read as follows:

> On December 31, 1994 qualified people who chose to retire will spend their last day at Eddystone. They will have elected back in August to retire. Although, at this time I have not made my choice, I would like to offer my services beyond 12/31/94 until 6/30/95. This six months would be a big help not only for me, but in assisting during the transition period. I could help with the craft and supervision, coming up through the ranks, and knowing both views on all issues. Being a 'people person', I feel I could be of great value. I have many ideas which I would share as I have in the past. Although I didn't get credit for these ideas, they have been implemented by others for the betterment of Eddystone. This was their original purpose.
>
> I realize that by extending my retirement date, if I choose to retire, by six months may not be in keeping with Vision Quest, I still felt compelled to offer.
>
> I hope to hear from you in the immediate future.

(R.933a). Prior to getting a response from PECO, Rath submitted his election form and

---

7. In fact, over 2,500 of PECO's employees, approximately 27% of its workforce, elected to accept either the early retirement or voluntary separation plans.

8. Had he elected to remain employed with PECO, Barclift would have been given another opportunity to take the test.

accepted the early retirement plan. He was given a release date of December 30, 1994. Later, PECO sent a memo to Rath thanking him for his offer, but stating that it did not need him to remain beyond his release date.

In each of the foregoing cases, the Unemployment Compensation Board of Review concluded that the claimants had been involuntarily separated from their employment when PECO refused to allow them to rescind their resignations or to extend their final termination date. PECO asserts,[9] however, that the claimants voluntarily left their employment by selecting either the early retirement plan or the voluntary separation plan, and did not effectively revoke these resignations before the company had relied upon their initial elections.

■ The issue of whether a claimant's separation from employment is voluntary is a question of law subject to our plenary review. *Neaus v. Unemployment Compensation Board of Review*, 165 Pa.Cmwlth. 326, 645 A.2d 356, 357 (1994), *appeal denied*, 540 Pa. 637, 658 A.2d 799 (1995). *See also Salerno v. Unemployment Compensation Board of Review*, 674 A.2d 776, 777 (Pa.Cmwlth.1996).

■ In *Soyster v. Unemployment Compensation Board of Review*, 197 Pa. Super.547, 180 A.2d 123 (1962), the court held that an employee who attempted to rescind her resignation after giving two weeks notice, was disqualified from receiving unemployment benefits where the employer had begun training a replacement. In so holding, the *Soyster* Court observed that, by giving two weeks notice, the employee had "set in motion the process whereby arrangements were made for her replacement." *Id.* at 549, 180 A.2d at 123. The court further declared that "a resignation voluntarily submitted could, under the circumstances, be relied upon by the employer notwithstanding a belated attempt to withdraw by the employee." *Id.* at 549, 180 A.2d at 123. Accordingly, "[i]t is the law in Pennsylvania that a resignation, later revoked, remains a voluntary termination of employment if the employer has taken steps to replace the employee before the revoca-

tion." *Hale v. Unemployment Compensation Board of Review*, 57 Pa.Cmwlth. 245, 425 A.2d 1216, 1217 (1981).

■ On the other hand, if an employee revokes a resignation before the employer has taken steps to replace him, the termination thereafter is involuntary. *Tretter v. Unemployment Compensation Board of Review*, 62 Pa.Cmwlth. 70, 434 A.2d 919 (1981); *Stroh–Tillman v. Unemployment Compensation Board of Review*, 167 Pa.Cmwlth. 154, 647 A.2d 660 (1994). Similarly, where an employee attempts to postpone, rather than to rescind, a resignation, before the employer has made other arrangements, the employee is entitled to benefits for the rejected extension period. *Zimmerman v. Unemployment Compensation Board of Review*, 101 Pa. Cmwlth. 274, 516 A.2d 102 (1986), *appeal denied*, 515 Pa. 591, 527 A.2d 549 (1987). In these circumstances, the claimant has the burden of proving that arrangements had not been made for his replacement at the time he attempted to revoke or postpone his resignation. *Goughnour v. Unemployment Compensation Board of Review*, 54 Pa.Cmwlth. 83, 420 A.2d 30, 32 (1980).

While these cases involving the one-on-one replacement of a necessary worker offer guidance to our analysis, they clearly are not directly applicable to the circumstances presented here. PECO's offer of the enhanced retirement and separation benefit plans were but the first step in an overall downsizing and restructuring of the Company. At the same time, PECO was conducting studies in each of its departments aimed at identifying changes that could be made in department structure as well as reductions in workforce. In planning such changes, PECO asserts that it was necessarily relying upon the number of employees who elected to voluntarily leave the company by accepting the benefit packages. Once all the employees had made their elections, PECO was able to assess how to redistribute the work among remaining employees, and then determine whether further workforce reductions would be needed

---

**9.** An *amicus curiae* brief in support of PECO's position has been submitted by the Pennsylvania Chamber of Business and Industry.

through involuntary layoffs, as well as whether additional persons with specific skills would have to be hired. In this context, we believe the issue is not whether any given employee had been replaced when he attempted to revoke his resignation, but whether PECO reasonably relied upon the claimants' initial decisions. Indeed, the principle underlying the *Soyster/Tretter* line of cases is simply that of detrimental reliance. In this instance, we are satisfied that to the extent PECO relied upon the irrevocability of its employees' elections in going forward with the next steps of its restructuring plan that such reliance satisfies the *Soyster* standard. Further, in light of the time given employees to make their decisions (from April until September), and to change them (an additional seven days), such reliance was reasonable.

■ Review of the records in these cases, however, demonstrates an absence of such reliance in the cases of Thomas, Mattioni and Suarez. As noted above, Thomas did not attempt to revoke his resignation until December, *AFTER* PECO had concluded its evaluation of his department and decided not to make any changes, other than to replace those who had elected to leave.

Similarly, in the case of Suarez, the record reflects that as early as June 1994, PECO had already determined not to reduce the number of electricians in the Oregon shop, but, in fact to hire approximately five more. In December, when Suarez attempted to revoke his termination, continuing work was available for him. Indeed, in April 1995, at the time of Suarez' hearing, his manager was still in the process of hiring four additional electricians.

■ Unlike Thomas and Suarez, who did not attempt to revoke their elections until PECO had already determined not to eliminate their jobs, Mattioni attempted to change his mind before PECO began to evaluate its restructuring plans in light of the number of employees electing to accept voluntary separation or retirement plans. Mattioni had

elected to retire more than a month before he was required to make his decision. He attempted to revoke on or about the end of the election window period. Seven months later, as of the date of Mattioni's hearing, his position had still not been filled. Under these circumstances, it is clear that PECO had not detrimentally relied, in any fashion, upon the elections of Thomas, Suarez or Mattioni, nor upon the irrevocability of those decisions at the time they expressed a desire to change their minds. Thus, PECO's refusal to allow them to revoke their acceptance of separation or retirement plans renders their subsequent terminations involuntary, and the Board's award of benefits [10] will be affirmed.

■ With respect to claimant Stahl, however, PECO presented evidence of reliance through the testimony of James King, a supervisor in the human resource department. He testified that Stahl was not allowed to revoke his termination because the company needed to assess "what the changes were that we were going to have to make in order to accommodate the number of people who accepted [the retirement or severance plan], the determination in his organization [whether] we can consolidate some job responsibilities and we can do some work differently ..." (R.173a). He further testified that the assessment or "re-engineering" process was still ongoing as of the hearing date, March 6, 1995. This testimony was not contradicted or rebutted in any fashion. Thus, we must conclude that claimant Stahl failed to meet his burden of proving that PECO did not rely on his voluntary resignation, *Goughnour,* 420 A.2d at 32, and the Board erred in holding that Stahl was involuntarily terminated.

■ The Board asserts in the alternative that, even if Stahl voluntarily left his employment at PECO, he did so for cause of a necessitous and compelling nature. In this regard, the Board contends that, at the time Stahl accepted the early retirement plan, he reasonably believed that continuing work was

---

10. It may be noted that the issue of pension offsets addressed by this court in the companion case of *PECO Energy Company v. UCBR,* 682 A.2d 36 (Pa.Cmwlth.1996), and cases consolidated therewith (*PECO Pension I* ) was not raised in any of these cases.

not available to him if he had elected to remain with the company.

Pursuant to Section 402(b) of the Unemployment Compensation Law,[11] "[A] claimant who becomes unemployed by a voluntary termination of his position bears the burden of proving that the termination was for cause of a necessitous and compelling nature." *Anchor Darling Valve Co. v. Unemployment Compensation Board of Review,* 143 Pa.Cmwlth. 171, 598 A.2d 647, 649 (1991). Whether a claimant has a necessitous and compelling cause for terminating his employment is a question of law. *Department of the Navy v. Unemployment Compensation Board of Review,* 168 Pa.Cmwlth. 356, 650 A.2d 1138, 1140 (1994).

In determining whether, in the context of corporate downsizing, an employee who accepted an incentive package to terminate his employment voluntarily did so for necessitous and compelling cause, this Court has emphasized that "uncertainty and speculation about the future existence of a job does not create necessitous and compelling cause." *Department of the Navy v. Unemployment Compensation Board of Review, supra. See Peoples First National Bank v. Unemployment Compensation Board of Review,* 159 Pa.Cmwlth. 134, 632 A.2d 1014 (1993); *Flannery v. Unemployment Compensation Board of Review,* 125 Pa.Cmwlth. 64, 557 A.2d 52 (1989).

> [S]peculation pertaining to an employer's financial condition and future layoffs, however disconcerting, does not establish the requisite necessitous and compelling cause. Instead, the relevant inquiry is whether surrounding circumstances at the time an employee voluntarily leaves indicate a likelihood that fears about his or her job security will otherwise materialize, that serious impending threats to the employee's job will be realized and that the employee's belief that his job is imminently threatened is well founded.

*Staub v. Unemployment Compensation Board of Review,* 673 A.2d 434, 437 (Pa. Cmwlth.1996).

11. 43 P.S. § 802(b).

In the instant case, review of the record discloses that Stahl had not been told by PECO that he would be laid off if he did not accept the early retirement plan. Rather, the claimant's decision to leave the company was based upon speculative and uncertain fears about his job security. Therefore, Stahl did not have necessitous and compelling cause for voluntarily terminating his employment and the Board's decision to award benefits must be reversed.

Claimants Barclift and Carter–King present a somewhat different situation. They voluntarily accepted the early retirement plan offered by PECO and were scheduled to terminate their employment on December 30, 1994. *At PECO's request,* however, they agreed to postpone their resignations until September 30, 1995. Because thereafter PECO revoked the postponement of their resignations and required Barclift and Carter–King to terminate on December 30, 1994, the Board concluded that the terminations had been involuntary and that Barclift and Carter–King were entitled to unemployment benefits. We agree with the Board's determination.

In these cases, claimants met their burden of showing that PECO did not reasonably rely upon the irrevocability of their resignations effective December 30, 1994, because PECO asked them —and they agreed—to extend their employment until the following September. Thus, when PECO changed its mind, these claimants became entitled to benefits for the extension period.

*Amado v. Unemployment Compensation Board of Review,* 177 Pa. Super. 506, 110 A.2d 807 (1955), provides further support for the Board's determination. There, the claimant gave notice of his resignation effective on a certain date. Prior to that date, however, the employer trained and hired a replacement and terminated the claimant. The court held that the claimant was entitled to unemployment benefits from the date of termination until the date on which he had agreed to resign, because "the employer's act in accelerating the separation date was the proximate cause of his unemployment until

the date he selected as his resignation date." *Amado,* 177 Pa. Super. at 508, 110 A.2d at 808. Thus, "[t]he court reasoned that the claimant was discharged [involuntarily] for the period of time prior to the date on which he was to resign and that, after that date, claimant had voluntarily terminated his employment." *1030 North West End Boulevard, Inc. v. Unemployment Compensation Board of Review,* 53 Pa.Cmwlth. 314, 417 A.2d 294, 296 (1980); *Neaus v. Unemployment Compensation Board of Review,* 645 A.2d at 358.

By the same rationale, Barclift and Carter–King were involuntarily terminated from December 30, 1994 until September 30, 1995, the date on which they had agreed, at PECO's request, to resign. Therefore, we sustain the award of benefits.[12]

 Finally, the Board concluded that claimant Rath had been involuntarily terminated on December 30, 1994, because he had accepted the early retirement plan subject to a release date of June 30, 1995. Review of the record, however, discloses otherwise. Prior to accepting the early retirement plan, Rath merely offered to extend his services beyond December 30, 1994, until June 30, 1995. Nevertheless, Rath accepted the early retirement plan prior to getting any response from PECO, which subsequently declined Rath's offer. Thus, contrary to the cases of claimants Barclift and Carter–King, PECO had never agreed to extend Rath's service with the company and never unilaterally accelerated his date of resignation. Rather, Rath voluntarily accepted the early retirement plan subject to a release date to be established by PECO. When this release date was set at December 30, 1994, Rath made no attempt to rescind or postpone his retirement. Under these circumstances, the Board erred in its determination that claimant Rath was involuntarily terminated. Thus, we will reverse the award of benefits.

**ORDER**

AND NOW, this 16th day of August, 1996, at No. 1806 C.D.1995 (claim of Robert A. Thomas), the Order of the Unemployment Compensation Board of Review, No. B–337774, dated June 15, 1995, is hereby affirmed;

At No. 2077 C.D.1995 (claim of Barry L. Stahl), the Order of the Unemployment Compensation Board of Review, No. B–3374891–B, dated June 9, 1995, is hereby reversed;

At No. 2085 C.D.1995 (claim of Gilmore Barclift, Jr.), the Order of the Unemployment Compensation Board of Review, No. B–338698, dated July 21, 1995, is hereby affirmed;

At No. 2150 C.D.1995 (claim of Dominick L. Mattioni), the Order of the Unemployment Compensation Board of Review, No. B–338973, dated July 28, 1995, is hereby affirmed;

At No. 2224 C.D.1995 (claim of Angelo L. Suarez), No. B–339390, dated August 10, 1995, is hereby affirmed;

At No. 2537 C.D.1995 (claim of Annette Carter–King), No. B–341045, dated September 22, 1995, is hereby affirmed; and

At No. 2566 C.D.1995 (claim of Thomas D. Rath), No. B–340855, dated September 19, 1995, is hereby reversed.

---

**12.** Any eligibility for unemployment benefits on this basis would, of course, be limited to the extension period. In this case, however, the extension period of nine and one-half months exceeds the statutory twenty-six week benefit period. Therefore, no issue is presented and this court need not consider whether these two claimants' original resignations were for necessitous and compelling cause.