Edward James RENDA, Petitioner

v.

UNEMPLOYMENT COMPENSATION BOARD OF REVIEW, Respondent.

James Mazeitis, Petitioner

v.

Unemployment Compensation Board of Review, Respondent.

M. Pearl Smith, Petitioner

v.

Unemployment Compensation Board of Review, Respondent.

Ann Marie Silinskie, Petitioner

v.

Unemployment Compensation Board of Review, Respondent.

Donna U. Roscoe, Linda A. Youngbauer, Barbara R. Massy, Rose C. Slater, Eileen Heinack, Nancy A. Morgan, Yvonne Van Fleet, Barbara G. Pees, Robert Van Fleet, Harry E. Moore, Kenneth W. Auman, Jerry L. Weaver,

Suzanne J. Cover, James B. Strong, Allen D. Petras, Judith B. Seanor, Mary E. Strong, Margaret A. Glass, Frances M. Hill, Betty Lou Lambie, Lois M. Kukich, Sandra E. Clougherty, Judith F. Massari, Henry A. Sommovilla, Jr., Albert R. Beveridge, Christine M. Bruno, William L. Tansmore, Benjamin J. Vignoli, Maureen M. Davis, Dianne K. Madden and James A. Lazur, Petitioners,

v.

Unemployment Compensation Board of Review, Respondent.

Sheila Franks, Petitioner

v.

Unemployment Compensation Board of Review, Respondent.

Carol Jane Jolley, Petitioner

v.

Unemployment Compensation Board of Review, Respondent.

Susan Heidenreich, Petitioner

v.

Unemployment Compensation Board of Review, Respondent.

Jewel Johnstone, Petitioner

v.

Unemployment Compensation Board of Review, Respondent.

---

686

Marion Kane, Petitioner

v.

Unemployment Compensation Board
of Review, Respondent.

Mary Agnes Kane, Petitioner

v.

Unemployment Compensation Board
of Review, Respondent.

Mary Ann Owens, Petitioner

v.

Unemployment Compensation Board
of Review, Respondent.

Mary Oresick, Petitioner

v.

Unemployment Compensation Board
of Review, Respondent.

Darlene E. Patterson, Clifford Zigler,
and Gary Smith, Petitioners

v.

Unemployment Compensation Board
of Review, Respondent.

Phyllis M. Fields, Petitioner

v.

Unemployment Compensation Board
of Review, Respondent.

Adrianne R. Frollini, Petitioner

v.

Unemployment Compensation Board
of Review, Respondent.

Marilyn J. Fleischman, Jacqueline M.
Prescott, Karen E. Ogilvie, Teresa Es-
tok, Elizabeth G. Johnston, Denise M.
Ninehouser, Joann Thomas, Sharon
Ganaway, Sherri Shamonsky, Kath-
leen Brown, Marilyn G. Pielin, Debo-
rah A. Marnik, Donna Darlene Still,
Bernadette Calabro, Petitioners

v.

Unemployment Compensation Board
of Review, Respondent.

Richard W. Sibley, Petitioner

v.

Unemployment Compensation Board of
Review, Respondent (Two Cases).

Commonwealth Court of Pennsylvania.

Argued Oct. 8, 2003.

Decided Dec. 10, 2003.

John M. O'Connell, Jr., Greensburg, Girard J. Mecadon, Pittston and David F. Weiner, Pittsburgh, for petitioners.

Maribeth Wilt–Seibert, Harrisburg, for respondent.

BEFORE: COLINS, President Judge, and McGINLEY, Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, LEADBETTER, Judge, and SIMPSON, Judge.

OPINION BY Judge SIMPSON.

In these consolidated appeals, sixty-three similarly situated Claimants question whether the Unemployment Compensation Board of Review (Board) erred in determining they were ineligible for benefits under Section 402(b) of the Unemployment Compensation Law[1] (Law) (voluntary leave without cause of a necessitous and compelling nature). Because we agree Claimants' beliefs concerning future layoffs were speculative and Employer demonstrated continuing work was available to Claimants, we affirm.

Claimants are former Verizon (Employer) employees, with an average length of employment in excess of 30 years. Claimants were union members, and their employment was governed by two substantially similar collective bargaining agreements.[2] The agreements require Employer to offer employees an income security plan (ISP) or an enhanced income security plan prior to any layoffs.

1. Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended,* 43 P.S. § 802(b).

2. Pursuant to the agreements, Employer is required to follow certain procedures prior to laying-off regular, full-time employees. Employer must first lay off temporary and part-time employees. Next, full-time employees must be laid off in order of reverse seniority;

On November 19, 2001, Employer offered an enhanced income security plan (EISP) to employees in various departments. The notice read, in part:

Dear Employee,

This is to inform you that your job is in a work group that is subject to a force adjustment. The Company, therefore, is offering you the opportunity to elect to leave the service of the Company and receive EISP benefits pursuant to the provisions in the collective bargaining agreement. You should understand that EISP elections will be granted to the extent necessary to relieve the surplus, in the order of seniority among those eligible employees. The start date for this EISP offer will be November 19, 2001 and the date that EISP closes will be December 18, 2001. If you volunteer to leave under the terms of this EISP offer, and you are accepted, your last day on active payroll will be December 29, 2001.

Hearing of May 7, 2002, Exhibit C–1. A question and answer form attached to the notice explained an income security plan is:

an offer under which eligible associates can decide to voluntarily leave the company and, if their application is accepted, receive certain benefits. An ISP is offered when Verizon reduces its associate workforce either as a result of technological change . . . or as a result of other conditions.

however, Employer is allowed to retain four percent or five percent, depending on the agreement, from each of its 15 work groups without respect to seniority. Under the agreements, employees who work in a department considered a surplus are given first choice on bids on other jobs, and they also are eligible for a transfer.

An Enhanced ISP enables an eligible associate to receive a termination allowance that is [twice that of a regular ISP].

*Id.* (emphasis deleted).

The EISP offered eligible employees $2,200.00 for each year of completed service, up to a maximum of $66,000.00. It also offered an EISP expense allowance up to a maximum of $3,750.00, and a five-percent increase in pension benefits.[3]

Employer also sent Claimants an e-mail entitled "Update on Force Adjustment Initiatives" that stated in part:

As a result of the economic downturn, increased competition and technology displacement, the Company has experienced significant declines in customer demand. In order to manage revenue shortfalls and costs associated with these trends, and appropriately match work force requirements, the Company is offering a force adjustment program as part of our contractual requirements.

Hearings May 7, 2002, Exhibit C–2.

Employer did not hold any informational meetings with respect to the EISP offer, and employees were advised to consult their collective bargaining agreements for more details. The collective bargaining agreement between Employer and Local 13,500 states, in pertinent part:

Article 21

Income Security Plan

Enhanced Income Security Plan

21.01 If during the term of this Agreement, the Company notifies the Union in writing that technological change ... has or will create a surplus in any job title in a work location which will necessitate lay-offs or involuntary permanent reassignments of regular employees to different job titles involving a reduction in pay or to work locations involving a change of residence, or if a force surplus necessitating any of the above actions exists for reasons other than technological change and the Company deems it appropriate, regular employees who have at least one (1) year of net credited service may elect, in the order of seniority, and to the extent necessary to relieve the surplus, to leave the service of the Company and receive Income Security Plan (ISP)and if applicable, during the term of this agreement, Enhanced Income Security Plan (EISP) benefits....

21.02 ISP Termination Allowance

(a) For an employee who so elects ... the Company will pay an ISP Termination Allowance of One Thousand One Hundred Dollars ... for each completed year of net credited service ... for a maximum of Thirty Three Thousand Dollars.... Furthermore, prior to proceeding to a layoff resulting from a surplus in any particular title, location, and work group, the Company will offer an Enhanced ISP Termination Allowance equal to two (2) times the normal ISP Termination Allowance ... in the surplus title and location.

Hearing May 7, 2002, Exhibit C–3.

Before the referees, Claimants testified they became anxious about job security

---

**3.** Employees who received a "force adjustment package" were eligible for a five percent pension increase and a lump sum pension option scheduled to become effective in the summer of 2002. Hearing of May 7, 2002, Exhibit C–2.

due to Employer's (i) increased reliance on new technology; (ii) lack of new hires; (iii) reductions in available overtime; (iv) reductions in the number of employees in their various departments; and (v) transfer of work duties to other locations. They also testified concerning rumors that Employer intended to close offices and consolidate its workforce in other locations. Claimants testified the EISP offer, combined with the language of the memos, e-mail and the collective bargaining agreements, confirmed their fears.

Significantly, Employer's witnesses testified Claimants were not told there would be layoffs. Employer's witnesses further testified continuing work was available to all Claimants, and no layoffs followed the EISP offering. *See* Hearing April 11, 2002, Notes of Testimony (N.T.) at 6; Hearing April 30, 2002, N.T. at 13; Hearing May 7, 2002, N.T. at 43; Hearing May 8, 2002, N.T. at 45–6; Hearing May 9, 2002, N.T. at 42–3, 47; Hearing May 10, 2002 N.T. at 11–3; Hearing May 22, 2002, N.T. at 26–7; Hearing June 12, 2002, N.T. at 24–5.

■■■ The referees found all Claimants chose to accept the EISP because they thought their jobs with Employer were uncertain. Of particular importance here, the referees also found that Employer never specifically told any of the Claimants they would be laid off and that continuing work remained available to them. Based on these findings, the referees determined

Claimants voluntarily terminated their employment without cause of a necessitous and compelling nature and denied benefits. The Board affirmed without opinion. Claimants appealed.[4]

On appeal,[5] Claimants argue the Board erred in determining they voluntarily quit without cause of a necessitous and compelling nature. Alternatively, Claimants assert they were eligible for benefits under the voluntary layoff option proviso set forth in Section 402(b) of the Law.

## I.

Claimants first assert the Board erred in determining they voluntarily terminated their employment without cause of a necessitous and compelling nature. Claimants assert the circumstances surrounding their decisions constitute real and substantial pressures that would compel a reasonable person to act in the same manner.

Pursuant to Section 402(b) of the Law, "[a]n employe shall be ineligible for compensation for any week . . . [i]n which his unemployment is due to voluntarily leaving work without cause of a necessitous and compelling nature. . . ." 43 P.S. § 802(b).

■■■ Necessitous and compelling cause "results from circumstances which produce pressure to terminate employment that is both real and substantial, and which would compel a reasonable person under the circumstances to act in the same manner." *McCarthy v. Unemployment Comp. Bd. of Review*, 829 A.2d 1266, 1270

---

4. Our review is limited to determining whether constitutional rights were violated, whether errors of law were committed, and whether findings of fact are supported by substantial evidence. *Pollard v. Unemployment Comp.*

*Bd. of Review*, 798 A.2d 815 (Pa.Cmwlth. 2002).

5. A total of 19 appeals were filed and consolidated for argument and disposition.

(Pa.Cmwlth.2003) (citations and quotations omitted). An employee voluntarily terminating employment has the burden of proving his termination was necessitous and compelling. *Mansberger v. Unemployment Comp. Bd. of Review,* 785 A.2d 126 (Pa.Cmwlth.2001). Whether an employee has necessitous and compelling reason to terminate his employment is a question of law reviewable by this Court. *Id.*

In the context of corporate downsizing, the critical inquiry is whether the fact-finder[6] determined the circumstances surrounding a claimant's voluntary quit indicated a likelihood that fears about the employee's employment would materialize, that serious impending threats to her job would be realized, and that her belief her job is imminently threatened is well-founded. *Mansberger; PECO Energy Co. v. Unemployment Comp. Bd. of Review,* 682 A.2d 49 (Pa.Cmwlth.1996); *Staub v. Unemployment Comp. Bd. of Review,* 673 A.2d 434 (Pa.Cmwlth.1996).

"[S]peculation pertaining to an employer's financial condition and future layoffs, however disconcerting, does not establish the requisite necessitous and compelling cause." *Staub,* 673 A.2d at 437.

> [W]here at the time of retirement suitable continuing work is available, the employer states that a layoff is possible but not likely, and no other factors are found ... that remove an employee's beliefs from the realm of speculation, a claim for unemployment benefits fails despite the offer to leave.

*Id.* (citation omitted).

Applying these principles, this Court denied benefits where a claimant's specula-

tive concerns over future employment prompted her voluntary termination. *Mansberger* (claimant voluntarily quit despite employer's statement that lost jobs would be "filtered" to other sections of company); *PECO Energy Co.* (claimant accepted early retirement package based on "postulations" of "what he felt could happen"); *Staub* (claimant accepted early retirement incentive based on his belief that employer's "poor financial condition" would result in layoff); *Dep't of Navy v. Unemployment Comp. Bd. of Review,* 168 Pa.Cmwlth. 356, 650 A.2d 1138 (1994) (claimant "believed" his job would be eliminated); *Peoples First Nat'l Bank v. Unemployment Comp. Bd. of Review,* 159 Pa. Cmwlth. 134, 632 A.2d 1014 (1993) (employer indicated a layoff was "possible," but employer "didn't think so"); *Flannery v. Unemployment Comp. Bd. of Review,* 125 Pa.Cmwlth. 64, 557 A.2d 52 (1989) (claimant accepted advanced retirement package based on his belief layoff was "inevitable," despite availability of continuing work).

Contrary to Claimants' assertions, this is not a case where an employer affirmatively stated, in the context of making retirement offers, layoffs would occur, without demonstrating continuing work was available.[7] *Compare Phila. Parking Auth. v. Unemployment Comp. Bd. of Review,* 654 A.2d 280 (1994) (employer refused to indicate which employees would be eliminated but informed claimant he was on a list of those who could be laid off); *Eby v. Unemployment Comp. Bd. of Review,* 157 Pa.

---

6. The Board is the fact-finder in unemployment compensation cases; however, our determination is based on the referees' findings because the Board adopted them as its own. *See Zimmerman v. Unemployment Comp. Bd. of Review,* 829 A.2d 735, 736, n. 2. (Pa. Cmwlth.2003).

7. Notably, *Teeters v. Unemployment Comp. Bd. of Review,* 719 A.2d 380 (Pa.Cmwlth.1998), relied on by Claimants, was expressly overruled by this Court. *See Mansberger,* 785 A.2d at 129, n. 7.

Cmwlth. 10, 629 A.2d 176 (1993) (employer informed claimant he was in a group of employees identified for elimination and continuing work was unavailable).[8]

*Staub* and *Mansberger* control. In *Mansberger,* the employer advised its employees, including the claimant, it was downsizing and offered a voluntary retirement plan including a $25,000 bonus. Although claimant was informed her department would be scaled back, she was advised the lost jobs would probably be filtered to other sections. Nevertheless, the claimant accepted the retirement plan. The Board denied benefits, concluding the claimant voluntarily terminated her employment without a necessitous and compelling reason because she "failed to demonstrate that there was a lack of suitable continuing work available to her ... and opted to retire and receive the cash." *Mansberger,* 785 A.2d at 128. This Court agreed, stating "[t]here is nothing in the record to indicate that continuing work would not be available to Claimant or that her employment was imminently threatened. The Board applied the correct standard and found Claimant did not meet her burden." *Id.* at 129.

Similarly, in *Staub,* the claimant was offered an early retirement incentive plan, which he accepted. The claimant's primary reason for accepting the plan was it allowed him to retire early. He also believed the employer's poor financial condition could later result in his termination, despite the fact continuing work remained

available. Notably, the claimant was not informed his job would be eliminated. We agreed with the Board that denial of benefits was proper as the claimant's speculative concerns did not provide a necessitous and compelling reason to voluntarily terminate his employment.

■ As in *Mansberger* and *Staub,* Employer here did not expressly inform Claimants their jobs would be eliminated. In addition, based on their collective bargaining agreements, Claimants were aware any downsizing would occur by reverse seniority. Therefore, Claimants, who averaged 30 years of employment, were under no imminent threat of termination. Indeed, the referees found Claimants' concerns over job security were speculative or uncertain. The referees also found Employer made continuing work available to Claimants. Because these findings are supported by substantial evidence, we cannot, nor will we, disturb them. *Mansberger.* Based on these findings, the referees properly determined Claimants failed to establish the requisite necessitous and compelling cause to voluntarily terminate their employment. *Mansberger; Staub; PECO Energy Co.; Dep't of Navy.*

## II.

Alternatively, Claimants argue they are entitled to benefits based on the voluntary layoff option proviso (VLO proviso) set forth in Section 402(b) of the Law, which provides, in pertinent part:

---

8. Claimants also argue the referee erred in excluding the testimony of other similarly situated Verizon employees who were granted benefits. At the hearing, the referee invited an offer of proof. Claimants vaguely explained these witnesses would testify they were granted unemployment benefits under similar circumstances. The referee deemed the testimony irrelevant. Claimants made no

further attempt to explain the relevance of this testimony and did not object to the closing of the record. We discern no error. *See Healey v. Unemployment Comp. Bd. of Review,* 36 Pa.Cmwlth. 415, 387 A.2d 1025, 1027 (1978). *See also* Pa.R.E. 403 (exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time).

no otherwise eligible claimant shall be denied benefits for any week in which his unemployment is due to *exercising the option of accepting a layoff,* from an available position pursuant to a labor-management contract agreement, or pursuant to an established employer plan, program or policy....

43 P.S. § 802(b) (emphasis added).

Claimants request this Court overrule *Sievers v. Unemployment Comp. Bd. of Review,* 124 Pa.Cmwlth. 52, 555 A.2d 260, *aff'd per curiam,* 520 Pa. 83, 551 A.2d 1057 (1987), in which we did not apply the VLO proviso to a claimant who accepted an early retirement incentive package. In *Sievers,* the claimant voluntarily accepted an early retirement package that was designed to effectuate staff reductions by allowing management employees to voluntarily terminate their employment. Thereafter, the claimant applied for benefits. The referee denied benefits, determining claimant's beliefs concerning future layoffs were speculative and continuing work was available. The Board affirmed. Before this Court, the claimant asserted he did not voluntarily terminate his employment but was laid off. Concluding the referee's findings that Claimant voluntarily terminated his employment were supported by substantial evidence, we affirmed.

■ As in *Sievers,* the VLO proviso is inapplicable here. The referees specifically found Claimants voluntarily terminated their employment to receive the EISP. Claimants did not exercise the option of a voluntary layoff because, as found by the referees, continuing work was available to all Claimants. Because Claimants failed to establish they exercised a voluntary layoff

option pursuant to contract or established employer plan, we discern no error from the referees' failure to find Claimants eligible under the VLO proviso. *See George v. Unemployment Comp. Bd. of Review,* 767 A.2d 1124 (Pa.Cmwlth.2001) (VLO proviso does not apply to situations involving acceptance of severance or retirement incentives); *Flannery* (voluntary retirement plan does not fall within statutory VLO proviso such that claimant who took advantage of plan could receive benefits).[9] Therefore, we decline to overrule *Sievers.*

### III.

Concluding Claimant Mary Agnes Kane's (No. 1891 C.D. 2002) appeal was untimely, the referee declined to address her appeal on the merits. In support, the referee made the following findings. On February 11, 2002, the UC service center issued a Notice of Determination stating Kane was ineligible for benefits under Section 402(b) of the Law. A copy of the Notice was mailed to Kane at her last known address, and it was not returned as undeliverable by the postal authorities. The Notice stated in three places "the last day to appeal this determination is February 26, 2002." According to the official postmark, Kane did not mail her appeal until February 28, 2002. The referee specifically found Kane was not misinformed or misled in any manner with regard to her appeal.

Kane asserts the referee erred in dismissing her appeal as untimely. She contends her late appeal was occasioned by the misleading statement of a Service Center employee regarding the length of the appeal period.

---

**9.** *Compare W.R. Grace & Co. v. Unemployment Comp. Bd. of Review,* 71 Pa.Cmwlth. 86, 455 A.2d 729 (1983) (evidence supported referee's finding that employer afforded claimant, who was bumped from first shift duties due to depressed sales, the option of taking voluntary layoff plan, rather than accepting second or third-shift employment).

■ Pursuant to Section 501(e) of the Law, an appeal must be filed "within fifteen calendar days after such notice was delivered to him personally, or was mailed to his last known post office address." 43 P.S. § 821(e). This 15–day time limit is mandatory and subject to strict application. *Lin v. Unemployment Comp. Bd. of Review*, 558 Pa. 94, 735 A.2d 697 (1999). "If an appeal from a determination ... is not filed within [15] days of its mailing, the determination becomes final, and the Board does not have the requisite jurisdiction to consider the matter." *Id.* at 97, 735 A.2d at 699. A showing of fraud or breakdown in the administrative process, however, may justify an untimely appeal. *Stana v. Unemployment Comp. Bd. of Review*, 791 A.2d 1269 (Pa.Cmwlth.2002). Further, negligence on the part of an administrative official may be deemed the equivalent of fraud. *Id.*

■ The regulatory provision governing the time for filing an appeal states "[t]he date of initiation of an appeal delivered by mail, either on the prescribed appeal form or by any form of written communication, shall be determined from the postmark appearing upon the envelope in which the appeal form or written communication was mailed." 34 Pa.Code § 101.82(d). The term "postmark" means a United States postmark, i.e., one placed on the envelope by the United States Postal Service. *Lin; Copyright, Inc. v. Unemployment Comp. Bd. of Review*, 739 A.2d 219 (Pa.Cmwlth.1999).

■ Here, Kane's final day to appeal was February 26, 2002. The United States postmark on Kane's appeal letter is dated February 28, 2002. Thus, the referee properly determined her appeal was untimely.

When asked to explain the delay in filing her appeal, Kane's testimony was uncertain. She testified, based on her phone conversation with a Department employee which occurred a day before the due date, she thought she had 10 days from that date to file her appeal. Hearing May 7, 2002, N.T. at 8–9. Based on this vague testimony, the referee found Kane was not misinformed or misled in any way concerning her appeal. In making this finding, the referee clearly rejected Kane's testimony. This credibility determination will not be disturbed on appeal.

Based on the foregoing, we affirm.[10]

### ORDER

AND NOW, this 10th day of December, 2003, the orders of the Unemployment Compensation Board of Review in the above-captioned matters are AFFIRMED.

Judge FRIEDMAN concurring and dissenting.

I agree with the majority's conclusion that the appeal of claimant Mary Agnes Kane was untimely. However, I strongly

---

10. Claimant Yvonne Van Fleet contends the referee erred in determining she voluntarily terminated her employment because Employer refused to allow her to revoke her resignation. We disagree for two reasons. First, Van Fleet's attempt to revoke her resignation occurred after the December 18, 2001 deadline set by Employer. Second, Van Fleet failed to prove Employer did not detrimentally rely on her resignation. Therefore, the referee properly denied benefits. *PECO Energy Co. v. Unemployment Comp. Bd. of Review*, 682 A.2d 40 (Pa.Cmwlth.1996) (claimant who attempted to revoke resignation pursuant to early retirement plan failed to prove employer had not detrimentally relied on resignation in process of downsizing company; therefore, claimant was ineligible for benefits).

disagree with the majority's decision with respect to the remaining claimants. I do not concur with the majority's holding that *Mansberger v. Unemployment Compensation Board of Review,* 785 A.2d 126 (Pa. Cmwlth.2001), and *Staub v. Unemployment Compensation Board of Review,* 673 A.2d 434 (Pa.Cmwlth.1996), are controlling, because those cases are factually distinguishable from the situation now before us.

In *Mansberger,* the employer informed the claimant that lost jobs probably would be filtered to other sections. In contrast, Claimants in this case received no information from Employer indicating that continuing work would likely be available to them. In fact, Claimants observed that, because Employer's offer was made to all departments, the prospect of a transfer appeared remote. In *Staub,* the claimant testified that his primary reason for accepting an early retirement incentive plan was the opportunity to retire at the age of fifty-two. Unlike the claimant in *Staub,* Claimants here testified that they had no desire to retire early and would have continued working had they not felt compelled by the totality of the circumstances to accept Employer's offer.

The majority likens this case to *Mansberger* and *Staub,* pointing out that, as in those cases, Employer here did not expressly inform Claimants that their jobs would be eliminated. (Majority op. at 693). However, because Employer here refused to provide Claimants with *any* information concerning the likelihood of continuing employment, I believe Claimants did not need to establish that Employer "affirmatively stated . . . layoffs would occur," (Majority op. at 693), in order to be entitled to benefits.

Although Employer did not *expressly* state that Claimants would be laid off, Claimants could reasonably infer from Employer's conduct that layoffs were indeed imminent. In this case, the only information provided to Claimants regarding the possibility of layoffs was a description of the enhanced income security plan (EISP) and an e-mail advising them that, because Employer "has experienced significant declines in customer demands," it was "offering a force adjustment program *as part of our contractual requirements.*" (Hearing May 7, 2002, Record Exhibit C–2 (emphasis added).) In response to requests for additional information, Claimants were advised to consult their collective bargaining agreements for more details. The plain language of the collective bargaining agreements distinguished between circumstances where Employer deemed it appropriate to offer an ISP and circumstances where Employer was *required* to offer an EISP, i.e., *prior to proceeding to a layoff.* Having to decide whether to accept the EISP offer on the basis of this information alone, I believe that Claimants justifiably felt compelled to choose early retirement in the face of likely job loss.

We are required to look at the circumstances surrounding a claimant's departure from the claimant's point of view. *PECO Energy Co. v. Unemployment Compensation Board of Review,* 682 A.2d 49 (Pa. Cmwlth.1996), *appeal denied,* 547 Pa. 739, 690 A.2d 238 (1997). The totality of the circumstances surrounding Employer's early retirement offer include Claimants' desire to continue working, notice that Claimants were in a work group subject to a force adjustment, declines in customer demand and corresponding reductions in available work and staffing, the language of the EISP offer and Employer's reference to the terms of the collective bargaining agreements, which reflect that the offer of early retirement must be made prior to layoffs. Unlike the majority, I would

hold that these circumstances constitute real and substantial pressures on Claimants to accept Employer's enhanced early retirement offer.

Therefore, I would reverse.

Judge SMITH–RIBNER joins this dissent.