**PECO ENERGY COMPANY, Petitioner,**

v.

**UNEMPLOYMENT COMPENSATION
BOARD OF REVIEW, Respondent
(Three Cases).**

Commonwealth Court of Pennsylvania.

Argued June 11, 1996.
Decided Aug. 16, 1996.

Roslyn G. Pollack, for Petitioner.

Maribeth Wilt–Seibert, Assistant Counsel, for Respondent.

Before COLINS, President Judge, LEADBETTER, J., and LORD, Senior Judge.

LORD, Senior Judge.

PECO Energy Company (PECO) petitions this Court for review of Unemployment Compensation Board of Review (Board) orders affirming a referee's award of benefits to claimants Thomas L. Supplee, Edward J. Galligan, Jr. and John C. Nagle pursuant to Section 402(b) of the Unemployment Compensation Law (Law), Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(b) [relating to the voluntary termination of employment for cause of a necessitous and compelling nature].

On April 14, 1994, PECO offered its employees either a voluntary separation incentive plan or a voluntary retirement incentive plan, both of which afforded separation and retirement benefits beyond those available under existing company policies. Employees who would be fifty years old by December 31, 1995, who had given at least five years of service, were offered both plans; all employees were offered the voluntary separation plan. Employees had a window of time from July 5, 1994 to September 16, 1994 to decide whether to accept one of the plans.

The voluntary separation plan afforded employees a lump sum equal to three weeks of pay for every one year of service with PECO, up to sixty-five weeks of pay or $100,-000.00. This plan also continued company-paid medical and dental benefits for one year. The enhanced retirement plan amended PECO's retirement pension plan. Before the amendment, PECO employees could retire at sixty years old with full pension benefits or any time after reaching fifty-five years old with early retirement pension discounts of four percent per year. After the amendment, an employee could retire at fifty years old with one hundred percent of his pension intact. The plan still provided for PECO's one-hundred-percent funding of the pension without employee contributions. Pursuant to the enhanced retirement plan, an employee retired with full medical benefits paid for by PECO.

In the event an employee did not accept one of these plans and was later laid off for lack of work, the employer had a reduction-in-force policy providing employees with two weeks of pay for every one year of service with PECO, up to fifty-two weeks. This policy also afforded employees a continuation of company-paid medical and dental benefits for one year.

Eventually, more than twenty-five-hundred employees opted for one of the enhanced separation plans, including Supplee, Galligan and Nagle, who were engineers with PECO. Supplee, who was fifty-six years old when he separated from employment, opted for the early retirement plan; Galligan and Nagle, ages thirty-two and forty-seven respectively at the time of separation, chose the voluntary separation plans. All three men applied for unemployment benefits.

The Office of Employment Security (OES) awarded benefits to the three men, and the referee affirmed, deciding that each claimant

had a reasonable belief he was in danger of losing his job and, therefore, each claimant acted reasonably in opting for one of the plans. The referee also determined that the employer could not prove that continuing work existed for the claimants had they not chosen one of the plans. On appeal, the Board affirmed, relying for its decisions on the referee's findings of fact and conclusions of law. PECO's petitions for review to this Court followed. These cases were consolidated for argument and disposition.

■■■ PECO raises one issue for our consideration. That is, whether certain employees who accepted voluntary separation packages offered to all employees had necessitous and compelling cause to terminate their employment.[1,2] However, before we begin our discussion of the circumstances surrounding the separation from employment of each claimant involved in this consolidated appeal, we acknowledge the complexities inherent in deciding whether a claimant confronted with a corporate downsizing and an uncertain future had necessitous and compelling cause to leave his employment. Of course, our task in determining whether a claimant who opts for a separation package should receive unemployment benefits under section 402(b) is not made any easier by the fact that, most times, an employer cannot assure its employees of jobs until it sees what number of them have opted for the separation package. Equally, an employee who accepts a separation package often cannot know whether continuing work would have been available to him had he decided to remain employed.

After undertaking an in-depth examination of the pertinent law in this area, specifically, *Philadelphia Parking Authority v. Unemployment Compensation Board of Review,* 654 A.2d 280 (Pa.Cmwlth.1995), *Department of the Navy v. Unemployment Compensation Board of Review,* 168 Pa.Cmwlth. 356, 650 A.2d 1138 (1994), *Peoples First National Bank v. Unemployment Compensation Board of Review,* 159 Pa.Cmwlth. 134, 632 A.2d 1014 (1993), *Eby v. Unemployment Compensation Board of Review,* 157 Pa. Cmwlth. 10, 629 A.2d 176 (1993) and *Flannery v. Unemployment Compensation Board of Review,* 125 Pa.Cmwlth. 64, 557 A.2d 52 (1989), we explained in *Staub v. Unemployment Compensation Board of Review,* 673 A.2d 434 (Pa.Cmwlth.1996) as follows.

> We glean from the foregoing decisions that speculation pertaining to an employer's financial condition and future layoffs, however disconcerting, does not establish the requisite necessitous and compelling cause. Instead, the relevant inquiry is whether surrounding circumstances at the time an employee voluntarily leaves indicate a likelihood that fears about his or her job security will otherwise materialize, that serious impending threats to the employee's job will be realized and that the employee's belief that his job is imminently threatened is well founded.

*Id.,* 673 A.2d at 437.

### No. 1696 C.D. 1995

■■ As we have already stated, Supplee was fifty-six years old at the time he retired. There can be no doubt on this record that he felt compelled to do so, because he believed that if he did not, he would lose his job before obtaining any of the extra benefits to which he was entitled under PECO's en-

1. Our scope of review is limited to a determination of whether constitutional rights were violated, an error of law was committed, or necessary findings of fact are supported by substantial evidence. *Peoples First National Bank v. Unemployment Compensation Board of Review,* 159 Pa. Cmwlth. 134, 632 A.2d 1014 (1993). In cases where a claimant has voluntarily terminated his employment, "the burden is upon the employee to prove that he had a necessitous and compelling reason for leaving his employment." *Goffi v. Unemployment Compensation Board of Review,* 58 Pa.Cmwlth. 422, 427 A.2d 1273, 1274 (1981). Necessitous and compelling cause for voluntarily quitting employment is cause that "results from

circumstances which produce pressure to terminate employment that is both real and substantial, and which would compel a reasonable person under the circumstances to act in the same manner." *Taylor v. Unemployment Compensation Board of Review,* 474 Pa. 351, 358–359, 378 A.2d 829, 832–833 (1977).

2. The issue of pension offsets which we addressed in the companion case of *PECO Energy Company v. Unemployment Compensation Board of Review (PECO Pension I ),* 682 A.2d 36 (Pa. Cmwlth.1996) and cases consolidated therewith was not raised before this Court in this consolidated matter.

hanced early retirement plan. The referee considered Supplee's testimony as well as the testimony of PECO's witnesses and resolved all pertinent conflicts in his favor. The referee found, *inter alia,* that PECO never told Supplee his job would not be eliminated if he failed to accept the early retirement plan; that Supplee opted for the retirement plan due to his low seniority in his position, his lack of an engineering degree, and his understanding that his job duties would be eliminated in the reorganization; that Supplee had a good faith belief he would be furloughed due to PECO's new reduction-in-force policy; and that continuing work was not available to Supplee when he opted to retire.

We have read the notes of testimony with great care and conclude, based on its contents, that the referee and the Board erred in deciding Supplee was eligible for benefits under section 402(b). The basis for our decision is that even Supplee did not admit to a belief that, had he not accepted PECO's plan, his layoff would have been imminent. For example, Supplee testified:

> ... I was not looking at what was going to happen right now. I was looking at what was going to happen in the four-year window that would impact what benefits I would have at retirement, and, beyond that, even looking at the possibly [sic] contingency annuity option that I was able to take, which I would have had to have another eight years in order to do that, which results in a significant health kit if I weren't around for my wife. So I was making some postulations, or whatever, on what I felt could happen within the next four years.

(Notes of Testimony (N.T.), Testimony of Thomas Supplee, Hearing of March 3, 1995, p. 16).

Moreover, Supplee stated:

Q. So then, is it true that you based your decision to take this plan on, again, how enticing the plan was and the fact that you based it, also, on speculation that you might not have a job?

A. Yeah, I guess you could say that.

Q. And you could have continued to work for PECO Energy in the same capacity that you were employed?

A. I don't know that. I didn't know that for sure.

Q. But you didn't know that you ...

A. Right. I did not know for sure that I would continue to work, neither did I know for sure that I would not be, okay, and I don't believe that—I mean, it's getting back to my—or whatever—I don't believe that at that time anyone could have told me whether I would or would not definitely be employed, and no one would actually say, yes, you're going to be employed.

Q. But you never inquired as to what the status was?

A. No.

(N.T., Testimony of Thomas Supplee, Hearing of 3/3/95, pp. 19–20).

■ Although the referee and the Board did resolve any conflicts in the testimony in Supplee's favor, the record adequately demonstrates that there was no conflict with respect to the question of whether Supplee's layoff was imminent or in the discernible future. Instead, Supplee only testified to his *speculation* that he would be laid off, and the employer's witnesses testified to their *knowledge* that continuing work was available. As we stated in *Department of the Navy,* 650 A.2d at 1140, "uncertainty and speculation about the future existence of a job does not create necessitous and compelling cause" for the voluntary termination of employment.

We therefore reverse the Board's order affirming the referee's decision that Supplee was eligible for benefits under Section 402(b) of the Law.

### No. 2012 C.D. 1995

■ We previously set forth that Galligan was thirty-two years old when he separated from employment with PECO. The referee found that Galligan

> believed, in good faith, that he would be involuntarily laid off, based on the employer's plan to reorganize and eliminate the Modification Engineering Division of the Central Engineering Group, in which the claimant worked; the fact that the employ-

er did eliminate the Modification Engineering Division in the Central Nuclear Engineering Group shortly after the window closed; the claimant's evaluation which was on the low side of achieving expectations; and, because the claimant was not qualified for other postings while the window was open.

(Finding of Fact No. 20, Referee's Decision dated April 7, 1995, p. 3).

This factual finding served as a synopsis of other findings which, if supported by the record, could lead only to the conclusion that Galligan's fear of involuntary termination was more than just speculative. For example, the referee specifically found that Galligan understood from discussions within his department that the Central Nuclear Engineering Division was targeted for reorganization and elimination since much of its work was duplicative (Finding of Fact No. 13); after the window of time for accepting one of the plans closed, both the Modification Department and the modification engineering jobs were eliminated, with those functions moving to the sites (Finding of Fact No. 14); Galligan spoke to his direct supervisor about his fear of losing his job and his supervisor told him that continuing work was not assured (Finding of Fact No. 15); Galligan was evaluated on the low side of achieving expectations in August of 1994 (Finding of Fact No. 16); Galligan looked at other job postings while the window was open, but he was either unqualified or unpermitted to move laterally (Findings of Fact Nos. 17–18); and continuing work was not available to him (Finding of Fact No. 21).

Of course, we have thoroughly read the record, and we now conclude that Galligan's fear of imminent layoff was real and compelling. The factual findings of the referee delineated above are substantial and supported by the evidence, and the referee credited Galligan's version of events. As we already stated, the Board summarily affirmed the referee's decision. In accordance with "the relevant inquiry" as set forth in

*Staub*, we are satisfied that the circumstances surrounding Galligan's decision to quit pointed to the likelihood that, if he had not opted for the separation plan, he would have been involuntarily separated in any event.

This is so even where Galligan admitted that his boss did not approach him and tell him that he was targeted for termination (Notes of Testimony (N.T.), Testimony of Edward Galligan, Hearing of March 23, 1995, pp. 15–16), and where Carol Sawicki, Human Resources Generalist for PECO, testified that Galligan would still be employed at the Chesterbrook site, since "there was a wide range of opportunities for engineers" there. (N.T., Testimony of Carol Sawicki, Hearing of 3/23/95, p. 20). We are of course compelled to look at the circumstances surrounding a claimant's departure from *his* point of view, and where the record justifies a claimant's fear of impending layoff, and the Board believes *him*, benefits are warranted. This is particularly true in a situation where, as here, the employer's witness admitted to the fact that the claimant's position was to be eliminated (*see* N.T., Testimony of Carol Sawicki, Hearing of 3/23/95, p. 18), just as the claimant had feared.

As well, in this case, Galligan specifically testified: "I was told that [my] evaluation had the potential for being used as cause to eliminate me." (N.T., Testimony of Edward Galligan, Hearing of 3/23/95, p. 16). Although in *Gackenbach v. Unemployment Compensation Board of Review*, 51 Pa. Cmwlth. 475, 414 A.2d 770 (1980) and *Rizzitano v. Unemployment Compensation Board of Review*, 32 Pa.Cmwlth. 59, 377 A.2d 1060 (1977), we upheld decisions denying benefits to claimants who voluntarily left their jobs after receiving some form of criticism of their sub-standard job performances, these cases are inapposite, since they did not involve other factors, like corporate reorganization and downsizing, that here gave Galligan necessitous and compelling cause to terminate his employment.[3]

---

3. We note, too, that in a March 18, 1994 letter from Joseph F. Paquette, Jr., Chairman of the Board and Chief Executive Officer of PECO, to

his "Fellow Employees[,]" Paquette stated in relevant part:

After years of hearing about and preparing for the changing energy market, we have now

Accordingly, we affirm the Board's order sustaining an award of unemployment benefits to Galligan under section 402(b).

### No. 2080 C.D. 1995

We have already stated that Nagle was forty-seven years old at the time he separated from employment. The referee found that

> [a]lthough the claimant did not want to leave his employment, the claimant believed, in good faith, that he was being forced out of his employment, and that he would be involuntarily laid off, based on the claimant's developmental evaluation, which was below expectations, and would subject him to termination if there was no improvement; the employer's plan to eliminate the Technical Services Branch in which the claimant worked and to transfer the functions to the sites, thus eliminating positions in the Central Engineering Nuclear Group where the claimant worked; that the claimant's position and division was [sic] eliminated; and the employer's change of Employment Security Policy which would permit layoffs for professional employees, such as the claimant, based on performance.

(Finding of Fact No. 20, Referee's Decision dated April 7, 1995, p. 3).

The referee made other findings relevant to her decision that Nagle was entitled to benefits under section 402(b), including that, effective July 5, 1994, PECO changed its employment security policy to a reduction-in-force policy, with performance being the primary factor in determining who would be laid off (Findings of Fact Nos. 11–12); Nagle was demoted from his supervisory position in 1992 during a previous reorganization, but PECO found him another position in accordance with its employment security policy (Finding of Fact No. 13); in the spring of 1994, the Nuclear Group manager told the employees that many of the duties performed by the engineers in the Technical Services Division would be moved to the sites, and that the numbers in the Central Engineering Nuclear Group, of which Nagle was a part, would be reduced (Finding of Fact No. 14); and in June–July of 1994, Nagle received an evaluation of "developmental," which was below PECO's expected standards and which he had never before received in his twenty-four-and-one-half year history with PECO, and he was told if he did not improve, he would be terminated (Finding of Fact No. 15).

The referee also found that Nagle and his supervisor met to discuss his evaluation and, because of the type of complaints PECO had about his performance, Nagle had a good faith belief he would be unable to improve his performance and would be terminated at his next evaluation (Finding of Fact No. 16);

begun to actually feel the effect of those changes. Last year, several major commercial and industrial customers either renegotiated lower rates or chose to use other sources of energy, *costing us between $20–30 million in lost revenue.* Since the first of this year, the Philadelphia International Airport and Smith-Kline Beecham have elected to move to lower interruptible rates which *will also result in significantly reduced revenue.* Although the changing marketplace provides PECO Energy with exciting opportunities, *so far we have not been able to translate these opportunities into replacement income.* The new Strategic Business Units have been given a mandate to conduct a comprehensive review of their organizations to assess their ability to compete in this new environment. In the process, I have chartered them to ensure that future staffing decisions, from employment levels to *job security itself,* be justified by business needs and the necessity for the Company to improve performance dramatically. *True job security only exists if the Company is strong and viable.*

In order to position us to meet these challenges, I am taking this opportunity to inform you that we are seriously considering a program to offer financial incentives to eligible employees who may voluntarily retire or otherwise elect to terminate employment during a specified period of time. Senior Management has recently reviewed a number of alternatives, but none has been decided on to date or presented to the Board of Directors for its approval.

.    .    .    .    .

*I know the last few years have been difficult, and there are many times when I too wish for the comfort of the old days. Our challenge is to recognize the reality of things as they are and to make the best decisions under the circumstances* with the faith that everyone will understand and help. It is the only way we can take control of our future.

(Emphasis added).

while the window was open, Nagle talked to his supervisors about other possible positions, but they informed him there were none available (Finding of Fact No. 17); Nagle learned in August of 1994 that the Technical Services Branch was to be eliminated and it was eliminated after the close of the window (Finding of Fact No. 18); Nagle told his supervisor that he was afraid he would be terminated after the window closed; his supervisor could not reassure him there would be continuing work; (Finding of Fact No. 19); and continuing work was not available to Nagle (Finding of Fact No. 21). The referee and the Board resolved all pertinent conflicts in the testimony in Nagle's favor.

Our review of the record satisfies us that the above findings of the referee, as affirmed by the Board, are supported by substantial evidence. This being so, we may not overturn them on appeal. *See Hercules, Inc. v. Unemployment Compensation Board of Review,* 146 Pa.Cmwlth. 77, 604 A.2d 1159 (1992). Further, because they lead us to the ineluctable conclusion that Nagle's job was imminently threatened, even where PECO's witness testified that all nuclear engineers who opted to stay with PECO are still employed there (Notes of Testimony (N.T.), Testimony of Carol Sawicki, Hearing of March 21, 1995, p. 22), we will uphold the Board's award of benefits. In doing so, we note that Nagle himself testified the technical services division in which he worked had been eliminated (N.T., Testimony of John Nagle, Hearing of 3/21/95, pp. 15–16), and that PECO's witnesses did not refute this assertion.

We noted at the outset of this opinion that the question of whether an employee is confronted with real and substantial pressure to terminate his employment, such that he has necessitous and compelling cause for so doing, is a problematic one. As we explained in *Staub,* 673 A.2d at 437, the fact that an employer is inducing its employees to leave is a consideration we cannot ignore, although it is not dispositive of the issue. Clearly, we must examine the circumstances surrounding each claimant's departure on an individual basis, so as to understand what exigencies he faced at the time he decided to separate from employment.

Accordingly, the order of the Board, No. B–337293, dated June 5, 1995, is hereby reversed; the order of the Board, No. B–338475, dated July 12, 1995, is hereby affirmed; and the order of the Board, No. B–338702, dated July 21, 1995, is hereby affirmed.

### *ORDER*

AND NOW, this 16th day of August, 1996, the order of the Board, No. B–337293, dated June 5, 1995, is hereby reversed; the order of the Board, No. B–338475, dated July 12, 1995, is hereby affirmed; and the order of the Board, No. B–338702, dated July 21, 1995, is hereby affirmed.