**ELLIOTT COMPANY, INC., Petitioner**

v.

**UNEMPLOYMENT COMPENSATION BOARD OF REVIEW, Respondent.**

Commonwealth Court of Pennsylvania.

Argued June 8, 2011.
Decided Oct. 13, 2011.

---

Jarrod D. Shaw, Pittsburgh, for petitioner.

Paul R. Jordan, Assistant Counsel, Harrisburg, for respondent.

BEFORE: LEADBETTER, President Judge, and PELLEGRINI, Judge, and COHN JUBELIRER, Judge, and SIMPSON, Judge, and LEAVITT, Judge, and BROBSON, Judge, and BUTLER, Judge.

OPINION BY Judge COHN JUBELIRER.

Elliott Company, Inc., (Employer) petitions for review of the Order of the Unemployment Compensation Board of Review (Board), which reversed the Unemployment Compensation Referee's (Referee) determination that Paul J. Detruf (Claimant) is ineligible to receive unemployment compensation (UC) benefits under Section 402(b) of the Unemployment Compensation Law (Law),[1] 43 P.S. § 802(b), because he voluntarily quit his employment without cause of a necessitous and compelling nature. The Board found Claimant eligible for UC benefits after determining that Employer's change to its retirement health care plan constituted a necessitous and compelling reason for Claimant to quit his employment.

Claimant is a member of the United Steel Workers of America, Local 1145 (Union). Employer and Union ratified a new collective bargaining agreement (CBA) effective March 1, 2008, which included revisions to, among other employee benefits, Employer's former health care plan (pre–2008 plan), modifying some of the costs of the health plan. Employer's health care plan under the 2008 CBA (2008 plan) included a two-year window during which eligible employees, including Claimant, were permitted to retire and continue on the pre–2008 plan during retirement, until they reached age sixty-five, at which point they would become eligible for Medicare. Claimant retired during this window and filed for UC benefits, asserting that had he not retired before February 1, 2010, he would have suffered a substantial change in his health care benefits.

The Indiana UC Service Center (Service Center) denied benefits, stating that "there was insufficient information provided to indicate whether the Claimant had a necessitous and compelling reason for voluntarily leaving the job." (Notice of Determination at 1.) Claimant timely appealed and the Referee held a hearing at which both Claimant and Employer presented multiple witnesses. The Referee issued a decision affirming the Service Center's denial of UC benefits under Section 402(b) of the Law. The Referee noted that the burden was on Claimant to prove that he had a necessitous and compelling reason to quit his employment that resulted from circumstances that were both real and substantial. The Referee stated that he understood Claimant's dissatisfaction with the deductibles being added in the 2008 plan after years of limited employee costs, but reasoned that Employer provided competent evidence that economic conditions and soaring medical costs led to the nego-

1. Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended.*

tiated 2008 plan. Additionally, the Referee did not find the negotiated changes between the pre–2008 plan and 2008 plan to be so burdensome or substantial that it established a necessitous and compelling reason to quit. Accordingly, the Referee concluded that Claimant failed to meet his burden of proof and was ineligible for UC benefits under Section 402(b). (Referee's Decision/Order at 2.)

Claimant appealed to the Board. Claimant asserted that the increase in costs he would incur during his retirement under the 2008 plan was substantial and that he had to retire before his eligibility to participate in the pre–2008 plan during retirement expired on February 1, 2010. The Board reversed the Referee, and found the following facts:

1. From January 20, 1969 through January 29, 2010, the claimant was employed by [Employer] as a full-time manufacturing/processing clerk, earning $22.31 per hour.

2. [C]laimant voluntarily retired on January 29, 2010, due to concerns about the retiree health coverage.

3. [E]mployer's original health plan, the [pre–2008 plan], had $5.00 co-pays and no deductible.

4. Under the [pre–2008 plan], prescriptions cost only $5.00, and hospital expenses, whether inpatient or outpatient, were 100% covered.

5. In 2008, the union employees of [Employer] ratified a new contract which included negotiated changes to the employees' medical coverage.

6. All active employees were placed on the newly changed medical coverage, the [2008 plan] as of March 1, 2008.

7. The new medical coverage, the [2008] plan, included larger co-pays and deductibles.

8. The deductibles included ... $10.00, $20.00 or $35.00 for prescriptions, $20.00 co-pay for doctor visits and an out of pocket maximum of $1,000.00 per year for an individual and $2,000.00 per family.

9. The employees had an approximate two-year window from March 1, 2008 through February 1, 2010 to choose to retire with the original health care, the [pre–2008] plan, or retire after February 1, 2010 and have medical coverage under the [2008] plan until age 65.

10. This option was available for employees who were eligible to retire at 58 years of age with 30 years of service or 60 to 65 years of age with 20 years of service.

11. Employees who retired before February 2, 2010 were placed in the [pre–2008] plan from their retirement date until they reached the age of 65 at which time they go on Medicare.

12. Employees who retire after February 1, 2010, remain in the [2008] plan.

13. [C]laimant takes two prescriptions that were costing him $140.00 per month under the [2008] plan, but under the [pre–2008] plan only cost him $10.00 per month.

14. [C]laimant's wife has diabetes and she is taking five different prescription medications.

15. These medications under the [2008] plan cost [C]laimant between $10.00 and $35.00 a piece per month. Under the [pre–2008] plan they only cost [C]laimant $25.00 per month in total.

16. Because of her medical condition, [C]laimant's wife also had to make frequent visits to the doctor.

17. [C]laimant elected to retire rather than lose his vested right [to] health care benefits under the [pre–2008] plan in retirement.

(Board Decision, Findings of Fact (FOF) ¶¶ 1–17.) In sum, the two-year window provided an employee with the opportunity to try the 2008 plan while retaining the option to maintain the pre-2008 plan should he or she retire, if otherwise eligible, before February 2, 2010. The 2008 plan had some differences from the pre-2008 plan. (Employer's Ex. E–1, E–2, Summaries of PPO Benefits.) There was no change in the premium amounts to be paid by retirees under either plan; Employer paid 50% of the health insurance premiums for retirees aged 58 to 60 and 100% of the premiums for retirees aged 60 to 65. The 2008 plan included increases in co-payments from $5.00 to $20.00 for in-network doctor visits and from $5.00 for a 60–day supply to $10.00, $20.00 or $35.00 for a 30–day supply of generic, formulary, or non-formulary prescription drugs, respectively. Additionally, the mail order program for maintenance prescription drugs that formerly permitted a 60-day supply of either generic or brand name drugs with a $5 co-payment was changed to a $20 co-payment for generic, $40 co-payment for brand formulary, and $70 co-payment for brand non-formulary for a 90-day supply. There were also new out-of-pocket maximums of $1,000 for an individual or $2,000 for a family. (Employer's Ex. E–1, E–2, Summaries of PPO Benefits.)

Based on these findings, the Board analogized this case to *McCarthy v. Unemployment Compensation Board of Review*, 829 A.2d 1266 (Pa.Cmwlth.2003), concluding that, like the claimant in *McCarthy*, Claimant here was faced with a substantial reduction to his retirement health care benefits. (Board Decision at 3.) The Board further noted that Claimant had "a *vested* right to these benefits by virtue of the most recent CBA" and that "[C]laimant's actions were not based upon mere speculation." (Board Decision at 3 (emphasis in original).) The Board determined that the substantial change in Claimant's retirement health care benefits gave him a necessitous and compelling reason to leave his employment and, therefore, Claimant was eligible for benefits under Section 402(b) of the Law.

Employer petitioned this Court for review.[2] Thereafter, the Board filed an Application for Relief in the Form of a Motion for Consolidation of Cases (Application to Consolidate), for the instant case and seven related cases [3] involving Employer, alleging common questions of fact and law. (Board's Motion for Consolidation of Cases at 1–2, *Elliott Company v. Unemployment Compensation Board of Review*, No. 1787 CD. 2010.) This Court denied the Application to Consolidate by Order dated October 19, 2010, but granted the Board permission to file a lead brief and reproduced record, relevant portions of which could be adopted by reference in the briefs and reproduced records of the remaining cases, of which the instant case is one. *Elliott Company, Inc. v. Unem-*

---

**2.** Our review is limited to determining whether the Board's adjudication is in violation of constitutional rights, whether an error of law was committed, or whether the factual findings are supported by substantial evidence. *Nolan v. Unemployment Compensation Board of Review*, 797 A.2d 1042, 1045 n. 4 (Pa. Cmwlth.2002). Substantial evidence is that evidence which "a reasonable mind, without weighing the evidence or substituting its judgment for that of the fact finder, might accept as adequate to support the conclusion reached." *Centennial School District v. Department of Education*, 94 Pa.Cmwlth. 530, 503 A.2d 1090, 1093 n. 1 (1986).

**3.** Pending before this Court are a total of eight related, but unconsolidated cases: *Elliott Company, Inc. v. Unemployment Compensation Board of Review*, Nos. 1783–1787, 1914, 1937, 1938 C.D. 2010.

*ployment Compensation Board of Review,* (Nos. 1783–1787, 1914, 1937–1938 CD. 2010, filed October 19, 2010) (denying Application to Consolidate).

On appeal, Employer argues that the Board erred in finding Claimant eligible for UC benefits pursuant to Section 402(b) because: (1) Claimant failed to produce substantial evidence that the change from the pre–2008 plan to the 2008 plan resulted in a substantial change to Claimant's retirement benefits; and (2) Claimant merely took advantage of an enhanced retirement benefit and this case is, therefore, similar to *Diehl v. Unemployment Compensation Board of Review,* 4 A.3d 816 (Pa.Cmwlth.2010), *appeal granted,* —— Pa. ——, 20 A.3d 1192 (2011), rather than *McCarthy.*[4]

 Section 402(b) provides that a claimant shall be ineligible for benefits for a period "[i]n which his unemployment is due to voluntarily leaving work without cause of a necessitous and compelling nature." 43 P.S. § 802(b). The claimant who voluntarily terminates his employment has the burden of proving that a necessitous and compelling cause existed. *Petrill v. Unemployment Compensation Board of Review,* 883 A.2d 714, 716 (Pa. Cmwlth.2005). It is well settled that:

> an employee who claims to have left employment for a necessitous and compelling reason must prove that: (1) circumstances existed which produced real and substantial pressure to terminate employment; (2) such circumstances would compel a reasonable person to act

in the same manner; (3) the claimant acted with ordinary common sense; and (4) the claimant made a reasonable effort to preserve her employment.

*Brunswick Hotel & Conference Center, LLC v. Unemployment Compensation Board of Review,* 906 A.2d 657, 660 (Pa. Cmwlth.2006). The circumstances producing pressure to leave must be *both* real and substantial. *PECO Energy Co. v. Unemployment Compensation Board of Review,* 682 A.2d 49, 51 n. 1 (Pa.Cmwlth. 1996) (citing *Taylor v. Unemployment Compensation Board of Review,* 474 Pa. 351, 358–59, 378 A.2d 829, 832–33 (1977)). "An employer's unilateral imposition of a substantial change in the terms and conditions of employment provides a necessitous and compelling reason for an employee to leave work." *McCarthy,* 829 A.2d at 1270.

 We first address Employer's argument that Claimant did not meet his burden to prove that his desire to maintain his retirement health care benefits pursuant to the pre–2008 plan gave him a necessitous and compelling reason to voluntarily terminate his employment. Employer contends that Claimant failed to produce substantial evidence that the change from the pre–2008 plan to the 2008 plan resulted in a substantial change to Claimant's retirement benefits for the following reasons: (1) Claimant did not enroll in the pre–2008 plan upon his retirement while contending that he retired within the window in order to do so;[5] (2) even if Claimant retired subject to the 2008 plan *and* Claimant "maxed out his family's out-of-pocket ex-

---

**4.** We have consolidated and re-ordered Employer's arguments for ease of resolution.

**5.** Claimant testified that the reason he was not on either of Employer's retirement health care plans in his retirement "was because I will not be 60 years old until August. So I chose to go on a lesser plan because of costs, my wife's plan where she works, until August.

And in August, then I will come back and take advantage of the enhanced plan." (Referee Hr'g Tr. at 9–10.) Claimant would have been responsible to pay the 50% premium under either Employer's pre–2008 plan or 2008 plan until he reached age sixty. (Referee Hr'g Tr. at 9.)

penses of $2,000" under the 2008 plan, this "would represent just over 4% of his yearly salary," (Employer's Br. at 11); (3) Claimant's testimony that his two non-formulary prescriptions would cost $140.00 per month under the 2008 plan, rather than $10.00 per month under the pre–2008 plan, was inaccurate because the 2008 plan offers a mail order option through which he could obtain his two prescription drugs for less,[6] (Employer's Br. at 12); and (4) despite the fact that Claimant had two years prior to his retirement within which to evaluate the 2008 plan and compare his expenses under the 2008 plan to those under the pre–2008 plan, Claimant did not present evidence that retiring under the 2008 plan, rather than the pre–2008 plan, would result in a substantial decrease in Claimant's compensation.

Regarding Claimant's failure to meet his burden of proof, the Board acknowledges that "*it is not clear from the record how much Claimant's monthly pension benefit was. Therefore, it is not clear on a percentage basis what effect the change in health plans would have on Clamant in retirement*" (Board's Br. at 6 (emphasis added).) Yet, the Board asserts that this "*defect in the record . . . is not determinative,*" (Board's Br. at 6 (emphasis added)), " '[b]ecause there is no talismanic percentage for determining when a change is sub-

stantial, [and therefore, Claimant was] not required to produce specific testimony concerning the exact reduction in [his] rate of pay caused by changes in the health care plan.' " (Board's Br. at 6–7 (quoting *Chavez v. Unemployment Compensation Board of Review*, 738 A.2d 77, 82 (Pa. Cmwlth.1999)).) The Board argues that, under the 2008 plan, it was clear that had Claimant not retired by February 1, 2010, he would have been exposed to the $2,000 maximum per family out-of-pocket costs, (FOF ¶¶ 7–8), that "Claimant and his wife used the prescription benefit *extensively*," and that Claimant faced much higher monthly prescription co-pays, (Board's Br. at 7 (emphasis in original)). The Board further maintains that, because Claimant's wife is diabetic, the pre–2008 plan had special significance and intrinsic value for Claimant, the loss of which would be substantial to him in retirement. (Board's Br. at 7) (citing *Steinberg Vision Associates v. Unemployment Compensation Board of Review*, 154 Pa.Cmwlth. 486, 624 A.2d 237 (1993).)

■ In examining the question of whether the impact of the 2008 plan upon Claimant was substantial, we note that there is a lack of evidence concerning either his income before retirement or his retirement income. Employer estimates[7]

---

6. The summary of benefits for the 2008 plan indicates that the cost of two non-formulary brand prescriptions through the mail order home delivery would be $140.00 for a 90–day supply, or approximately $47.00 per month. (Summary of 2008 Plan Benefits, February, 2008, at 2, Employer's Ex. E–1.)

7. Employer derived Claimant's annual salary by multiplying his hourly wage in FOF ¶ 1 by 40 hours per week, times 52 weeks per year, to arrive at $46,000 annually. (Employer's Br. at 11 n. 3.) However, the record does not provide evidence regarding the number of hours Claimant worked in a given year, or other factors that could affect his annual

wages. Employer attempted to extrapolate further the impact of the potential costs of the 2008 plan on Claimant's wages based upon Claimant's testimony and surmised that there could be an 8% reduction to Claimant's wages, which it argues is not considered substantial under the law. (Employer's Br. at 12 n. 4.) However, because Claimant asserts that he retired in order to maintain the pre–2008 plan during his retirement up to age 65 when Medicare replaces the plan, it is Claimant's *retirement* income that must be used as the measure for whether his need to maintain the pre–2008 plan was substantial to him and, therefore, necessitous and compelling for him to retire before the window closed in order to

that the potential reduction to Claimant's yearly wages would be approximately 4% under the 2008 plan had he remained employed and not retired. However, Employer's estimates about Claimant's wages and the potential impact of the 2008 plan are not supported by documentary evidence and, although Claimant testified about what he believed he earned on an hourly basis, that testimony was not definite as to his annual income. Consequently, the Board is correct that there is no evidence of Claimant's annual wages. Additionally, the impact that the change in plans would have upon Claimant's retirement income is relevant but, again, Claimant has not provided evidence regarding the amount of his retirement income or the impact upon it. Nor did Claimant provide evidence of what the impact would have been had Claimant waited to retire until after the expiration of the window and, therefore, been foreclosed from maintaining the pre–2008 plan during his retirement prior to age 65. "Although this Court recognizes no talismanic percentage figure governing reductions in pay," the percentage by which a claimant's pay or retirement income is unilaterally reduced is a significant factor in determining whether the claimant had necessitous and compelling cause to quit employment. *Pacini v. Unemployment Compensation Board of Review*, 102 Pa.Cmwlth. 355, 518 A.2d 606, 608–09 (1986) (stating that a 5.9% reduction in pension income was not "a substantial figure sufficient to establish necessitous and compelling cause"). Because there is no evidence of Claimant's retirement income, we cannot evaluate the approximate percentage reduction that the 2008 plan may have caused to that income.[8]

Not only was there no evidence of Claimant's income, Claimant presented little evidence of what his actual expenses were during the two years in which he had to use the 2008 plan as his primary health care plan. Given this two-year trial period, Claimant could have presented evidence of the specific costs associated with both the pre–2008 plan and 2008 plan, however, he did not do so, presenting only generalized testimony based upon his recollection of costs.[9]

Because of the lack of evidence, we cannot determine whether the change in plans caused a substantial reduction to Claimant's retirement income.[10] Hence, Claim-

keep the pre–2008 plan during this period. However, the record does not contain any information about Claimant's retirement income.

8. We note that this case is distinguishable from *McCarthy*, in which the employer unilaterally eliminated all post-retirement health care benefits for employees who had worked for fifteen years and had reached the age of fifty-five before any post-retirement health care benefits would become effective. *McCarthy*, 829 A.2d at 1268. The claimant, who had already reached age fifty-five and had fifteen years of service, (and thus was fully eligible for post-retirement health care benefits under the previous plan) and who earned $20,000 per year, was compelled to retire within the very short window approximately two months from the date of the change in the plan in order to retain eligibility for post-retirement health care benefits. *Id.* This case is inapposite to the current matter, however, because a total elimination of post-retirement health care benefits is not involved here.

9. For example, although Claimant stated that his wife took five prescriptions and he took two, he presented no evidence of the total costs of those prescriptions under either plan. Claimant testified generally that his wife's prescriptions under the 2008 plan cost "between [ ] $10 and [ ] $35" but under the pre–2008 plan they were $5.00 each. Again, this included a potentially significant range of aggregate cost between $50.00 and $175.00. (Referee Hr'g Tr. at 4.)

10. We also note that Claimant did not enroll in either of Employer's health care plans

ant has not sustained his burden of proving that he had cause of a necessitous and compelling nature to voluntarily terminate his employment under Section 402(b).

With regard to the Board's argument that this case is analogous to *Steinberg Vision*,[11] where the negotiated health care plan represented an intrinsic value to the claimant beyond its bare monetary value, "we must examine the circumstances surrounding each claimant's departure on an individual basis, so as to understand what exigencies he faced at the time he decided to separate from employment." *Petrill,* 883 A.2d at 716 (quoting *PECO Energy Co.*, 682 A.2d at 55). Here, unlike the claimant in *Steinberg Vision,* Claimant presented no evidence that he ever negoti-

ated his own health care plan as a material element of his employment relationship with Employer before being hired. Additionally, Claimant neither alleged nor proved that he ever obtained additional benefits beyond those possessed by the other employees such that his benefits were of special intrinsic value to him. In fact, Claimant began working for Employer in 1969 and there is no evidence regarding what type of health care plan was in effect at that time or, in fact, at any time during his employment up until the 2004 CBA's plan establishing the pre–2008 plan. Therefore, we do not accept the Board's premise that the pre–2008 plan had the same kind of intrinsic value for Claimant as the plan in *Steinberg Vision* had for that claimant.

upon his retirement but, rather, chose to enroll in his wife's *lesser* plan. This decision further calls into question whether it was necessitous and compelling for him to retire in order to maintain the pre–2008 plan, when Claimant, in fact, did not maintain the pre–2008 plan; even if, as Claimant argues, his reason for enrolling in his wife's plan rather than Employer's pre–2008 plan was due to premium costs, there is no evidence about coverage or costs related to his wife's plan compared to either of Employer's plans.

11. In *Steinberg Vision*, the claimant, a diabetic, had specifically "negotiated a full employer reimbursement for" a particular health insurance plan "as a fringe benefit." *Steinberg Vision*, 624 A.2d at 238. The employer's cost of this reimbursement continued to rise along with increasing premiums and, several years later, after being notified of another premium increase, the employer informed the claimant "that it would no longer be reimbursing her for" this coverage. *Id.* at 239. The employer offered the claimant several alternatives, including providing the claimant with the same health care benefits it provided to its other employees or a partial reimbursement for the policy she had originally negotiated. *Id.* After the claimant refused these alternative proposals, she voluntarily quit her employment due to the termination of employer's reimbursement for this policy. *Id.* After the Board concluded that the employer's action was a

"substantial unilateral alteration of the conditions of [the c]laimant's employment sufficient to provide cause of a necessitous and compelling nature to quit," the employer petitioned this Court for review. *Id.* Although the employer argued, among other things, that "the reduction in compensation at issue was not so substantial as to justify [the c]laimant's quitting," this Court disagreed, concluding that *the full reimbursement* "was negotiated by the parties as a material element of the employment relationship, with a special significance to the [c]laimant, who relied upon the coverage for treatment of her diabetic condition and its attendant health consequences." *Id.* at 240. This Court noted that the claimant "would be required to incur an additional outlay of $170.68 per month in order to keep the negotiated coverage," *which sum represented a 14.2% reduction in her earnings. Id.* We explained that "a 14.2% wage reduction is at the cusp of what is considered to be a substantial impact," but that the loss involving a specific negotiation by a particular claimant for a special benefit, before being hired, that was different from the health care benefits provided to other employees, meant more than the "measurable dollar value to the [c]laimant." *Id.* For these reasons, the employer's unilateral discontinuation of reimbursement of the claimant's health insurance benefits was determined to be cause of a necessitous and compelling nature pursuant to Section 402(b) of the Law. *Id.*

In summary, Claimant has not met his burden of proving that the changes in health care plans were so substantial to him that he had cause of a necessitous and compelling nature to voluntarily terminate his employment and, therefore, Claimant is not eligible for UC benefits pursuant to Section 402(b) of the Law.[12] Accordingly, we must reverse the order of the Board.

## ORDER

**NOW,** October 13, 2011, the Order of the Unemployment Compensation Board of Review in the above-captioned matter is hereby **REVERSED.**

## DISSENTING OPINION BY Judge BUTLER.

Respectfully, I dissent. While I agree with most of the legal and factual analysis in the Majority Opinion, I *disagree* with the ultimate legal conclusion of the Court that "Claimant has not sustained his burden of proving that he had cause of a necessitous and compelling nature to voluntarily terminate his employment under Section 402(b)." Maj. Op. at 888–89. In my view, Claimant has indeed sustained his burden of proof. Moreover, the Majority has substituted, and improperly so, its findings of fact for those of the Unemployment Compensation Board of Review (Board).

The overarching issue of what constitutes "proof of a cause of a necessitous nature" has been quite extensively addressed by the Court in numerous opinions. However, within the context of the case *sub judice,* this Court has chosen to address only a few of the related issues which had formed the basis for much of

our deliberations.[1] This Court does so within the context of a "substantial evidence" analysis.

So as a threshold matter, it seems prudent to review the substantial evidence standard of review, which our Court must follow in unemployment compensation appeals. The substantial evidence standard of review is succinctly and properly described by this Court in the Majority Opinion.

> Our review is limited to determining whether the Board's adjudication is in violation of constitutional rights, whether an error of law was committed, or whether the factual findings are supported by *substantial evidence.* Substantial evidence is that evidence which "a reasonable mind, without weighing the evidence or *substituting its judgment for that of the fact finder, might accept as adequate to support the conclusion reached.*"

Maj. Op. at 885 n. 2 (emphasis added; citations omitted).

The failing of the Majority's Opinion/holding, and the predicate for this dissent, can be readily gleaned from the explicit language of the definition of "substantial evidence." The Court cannot substitute its judgment for that of the Board. Yet, the Majority has done just that. It has "substituted its judgment for that of the fact finder," *i.e.,* the Board. The Majority in its Opinion, and the Petitioner in its briefs, provide us with *their version* of the facts—and an analysis of the facts *as they see them.*

The Board's 17 Findings of Fact, on the other hand, are quite comprehensive and

---

12. Because of our disposition of this case on this issue, we do not reach Employer's remaining argument regarding whether Claimant retired pursuant to enhanced retirement benefits similar to *Diehl.*

1. See Maj. Op. at n. 8, and 888–90.

quite clear; and the Board's "Discussion," legal analysis, and "Conclusions of Law" are quite sound. Furthermore, the Board's brief in this matter, also quite comprehensively, describes how the Findings of Fact are adequate to support the conclusion reached by the Board.

Though it is true that the legal conclusions drawn by the Board from its Findings of Fact, remain subject to judicial review, the Board's factual findings are indeed conclusive on appeal if, as is the situation in this case, they are adequate to support the conclusion reached. Hence, the Majority cannot properly substitute its judgment as to the facts for that of the fact-finder, *i.e.*, the Board.

So, in conclusion, I would affirm the Order of the Board because its factual findings are supported by substantial evidence, and they are adequate to support the Board's Conclusion of Law that "the Claimant is *not ineligible* for benefits under the provisions of Section 402(b) of the Pennsylvania Unemployment Compensation Law."

Judge SIMPSON joins in this dissent.