IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Daryl Yingling, | : | |
| Petitioner | : | |
| | : | No. 127 C.D. 2019 |
| v. | : | |
| | : | Argued: December 10, 2019 |
| Unemployment Compensation | : | |
| Board of Review, | : | |
| Respondent | : | |

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE ANNE E. COVEY, Judge

OPINION BY
JUDGE McCULLOUGH                                        FILED:  February 28, 2020

Daryl Yingling (Claimant) petitions for review of the order of the Unemployment Compensation Board of Review (Board) dated January 8, 2019, affirming the decision of a referee denying him benefits under Section 402(b) of the Unemployment Compensation Law (Law).[1]  The Board concluded that Claimant failed to establish a necessitous and compelling reason to voluntarily terminate his employment.  Upon review, we reverse.

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. §802(b) (relating to voluntary separation from employment without cause of a necessitous and compelling nature).

## Background

Claimant, a resident of the Commonwealth, worked for Blinn College (Employer), located in Austin, Texas, from October 23, 2017, until June 29, 2018, as a full-time apartment manager. (Certified Record (C.R.) at Item Nos. 1, 2, 9, Findings of Fact (F.F.) No. 1.) Claimant voluntarily resigned from his employment, and thereafter filed for unemployment compensation benefits. (C.R. at Item Nos. 2, 9, Notes of Testimony (N.T.) at 10; F.F. No. 27.) The local service center determined that Claimant was ineligible for benefits under Section 402(b) of the Law, 43 P.S. §802(b). (C.R. at Item No. 5.) Claimant timely appealed the local service center's determination and a hearing was subsequently held by a referee on October 5, 2018, to consider whether Claimant had a necessitous and compelling reason for terminating his employment. (C.R. at Item Nos. 8, 9.)

Claimant and Tiffany Jenkins (Ms. Jenkins), Employer's Director of Human Resources, testified at the hearing. Claimant testified that when he accepted the job he was told that he was expected to work Monday through Friday, 8:00 a.m. to 5:00 p.m., and that an assistant apartment manager (Assistant Manager) would work Sunday through Thursday from 3:00 p.m. to 12:00 a.m. (N.T. at 10; F.F. No. 2.) Claimant explained that he was responsible for managing seven apartment buildings, which totaled 338 rooms and housed 338 students. (N.T. at 11; F.F. No. 4.) Further, Claimant explained that he was also in charge of seven student staff members (resident assistants). (N.T. at 10; F.F. Nos. 3, 4.) Claimant was also responsible for managing the student population within each of the buildings, checking students in and out, replacing lost keys, responding to emergencies and crises, being on-call, mediating conflicts with residents, responding to complaints, managing violations, preparing biweekly supervisory reports and weekly

maintenance reports, completing daily walk-throughs, working with custodial staff, and helping students. (N.T. at 11; F.F. Nos. 6, 8.)

Claimant testified that he understood that the Assistant Manager would split the duties with him and would be responsible for helping with any excess workload, maintenance requests, weekly meetings with staff members, and managing staff members. (N.T. at 13-14.) Claimant testified that he was told at the beginning of his employment that a full-time Assistant Manager would be hired. (N.T. at 13.) Claimant also explained that he asked his supervisor, Kayla Batterton (Ms. Batterton), when the Assistant Manager would be hired both before he arrived for his first day of work and on his first day of employment, and several more times in October, November, and December of 2017. *Id.* Claimant testified, however, that an Assistant Manager was never hired. (N.T. at 13; F.F. No. 5.) Claimant stated that he asked Ms. Batterton for assistance in performing his responsibilities, but that he was not given assistance as she believed that he did not need help performing his job duties. (N.T. at 14-15; F.F. No. 7.) Claimant stated that he felt that the lack of help was negatively affecting him. *Id.*

Claimant explained that during the 2018 spring break he asked Ms. Batterton to discuss his situation. *Id.* Claimant testified that Ms. Batterton was not willing to do anything to remedy the situation. *Id.* Claimant testified that he then complained to Human Resources, and was referred to Ms. Jenkins and spoke to her on April 18, 2018. (N.T. at 17; F.F. No. 14.) He testified that he told Ms. Jenkins about his concerns regarding his troublesome working conditions, health-related

issues, and problems arising from the fact that an Assistant Manager was not hired. (N.T. at 17, 27.)[2]

Claimant explained that Ms. Jenkins told him that she would address the issues with Ms. Batterton and Peter Rivera (Mr. Rivera), the Director of Residence Life. (N.T. at 17; F.F. No. 17.) Claimant explained that as of May 3, 2018, his situation was improving. (N.T. at 18; F.F. No. 18.) However, Claimant testified that the improvement did not last, and shortly thereafter his working conditions deteriorated because he was not given any help after two staff members quit. (N.T. at 18; F.F. No. 20.) He explained that he complained again to Ms. Batterton, who told him that there was plenty of help and that he did not need any more assistance. *Id*. Claimant testified that he then complained to Ms. Jenkins again on May 21, 2018, about the difficult working conditions and that he felt like a slave, had no free time, and had continuing health issues. *Id*. Ms. Jenkins suggested that he raise the issues with his supervisors directly, and if that did not resolve the situation to bring his concerns to the executive leadership of his department. (N.T. at 19, 34; F.F. No. 21.)

Claimant testified that he spoke to Mr. Rivera about his working conditions, but Mr. Rivera did not address his concerns. *Id*. Claimant explained that the lack of help and unsuccessful meetings made him feel like he did not have a

---

[2] As an aside, Claimant testified that the working conditions were affecting his health. Specifically, he testified that he had severe asthma and that the humidity was affecting him. (N.T. at 15.) He also testified that he was experiencing gastrointestinal issues. (N.T. at 16.) Despite Claimant's complaints to Employer about his medical conditions, he testified that he never provided any documentation, nor filled out any Americans with Disabilities Act (ADA), 42 U.S.C. §§12101-12213, accommodation paper work when he requested the golf cart from Ms. Batterton. (N.T. at 22.) Ms. Jenkins testified that Claimant did not make her aware of his health issues nor did he provide any medical documentation. (N.T. at 30-31; F.F. Nos. 11, 13, 16.) However, Ms. Jenkins explained that Employer had in place a specific process by which Claimant could have requested an accommodation. (N.T. at 38-39.)

chance to address his concerns and that nothing would change. (N.T. at 19-21.) Claimant explained that by that time, he estimated he was working 70-80 hours a week. (N.T. at 21.) In Claimant's last meeting with Mr. Rivera, on June 25, 2018, Claimant was again upset, but was told "you better work your butt off or this is not the right job for you." (N.T. at 22; F.F. No. 22.) Claimant was subsequently advised by Ms. Batterton that he was required to work on Sunday July 3, 2018, in order to check students in and out, and would not be provided additional help. (N.T. at 24; F.F. No. 24.) Claimant explained that because he was required to work on July 3 and was not getting any assistance or relief from his supervisors or Human Resources, he decided to quit. (N.T. at 25.) Before he resigned, Claimant attempted to contact Ms. Jenkins; however, because she was not in the office, he spoke with another human resources employee, Margaret Hoaty (Ms. Hoaty), who advised him to write a resignation letter. (N.T. at 24; F.F. Nos. 25, 26.) On June 29, 2018, Claimant resigned from his position. (N.T. at 24.) He explained that, although he intended to tell Ms. Jenkins why he was resigning, she was not in the office and so he resigned without telling her. *Id.*

Ms. Jenkins testified that Claimant complained to her about his working conditions. (N.T. at 31.) With respect to the Assistant Manager not being hired, Ms. Jenkins stated that Claimant told her he felt misled because he was told that an Assistant Manager would be hired, however, one had not been hired. *Id.* Ms. Jenkins testified that Employer had attempted to hire an Assistant Manager and actually started the process of interviewing candidates. (N.T. at 31.) She explained, however, that in early October 2017, Employer determined that its search had failed and decided to repurpose the position. (N.T. at 32.) She testified that she was unaware if anyone told Claimant the position would not be filled. *Id.*

5

Regarding Claimant's other complaints, Ms. Jenkins testified that most of Claimant's complaints revolved around his claims of lack of support and lack of appreciation. (N.T. at 32.) She stated that after her meeting with Claimant on April 18, 2018, she spoke with the vice chancellor of student services, who then spoke with Mr. Rivera. *Id.* She testified that she subsequently spoke with Claimant on May 3, 2018, and he told her that he had noticed some improvement. (N.T. at 33.) However, she explained that Claimant contacted her again on May 21, 2018, and told her that his situation had worsened. (N.T. at 34.) Ms. Jenkins stated that she told him to speak to his supervisors directly. *Id.* Ms. Jenkins explained that Claimant attempted to contact her before he resigned, but that she was out of the office so she did not respond. *Id.*

The referee made the following, pertinent, findings of fact:

2. When [] Claimant accepted the position, he understood that he would be working Monday through Friday, 8[a.m.] to 5[p.m.] and an [Assistant Manager] would be hired to work Sunday through Thursday, 3[p.m.] to 12[a.m.].

3. Claimant was also advised that he would have college staff, [and] resident assistants [that] he would be supervising.

4. There were seven apartment buildings with a total of 338 rooms and 338 students.

5. Employer did not hire an [Assistant Manager] and [] Claimant questioned his supervisor, [Ms. Batterton], regarding the position.

6. Claimant was responsible at the winter break to close down each apartment and get the key from each student and to review the rooms while the students were between terms.

6

7. When [] Claimant asked his supervisor for help, he was advised [that] he did not need help.

8. Claimant's job also involved daily walk[-]arounds.

* * *

10. Claimant's request to use the golf cart was denied.

11. Employer was not made aware that [] Claimant was requesting to use the golf cart for medical reasons.

12. Claimant advised [] Employer he wanted to use the golf cart due to walking distance.

13. Claimant did not provide any medical documents to [] Employer listing limitations or restrictions and did not notify [] Employer of any health issues.

* * *

16. When [] Claimant spoke with [Ms. Jenkins] on April 18, 2018, he did not advise her of any health issues, he said his request to use the golf cart due to walking distance was denied, he felt misled regarding the Assistant Manager position and many of his complaints centered around the lack of support from [Mr. Rivera].

17. [Ms. Jenkins] spoke with [] Claimant's supervisor [Ms. Batterton] and [Mr. Rivera] regarding [] Claimant.

18. A few weeks later, [Ms. Jenkins] reached out to [] Claimant and they met in her office on May 3, 2018, at which time [] Claimant indicated that things appeared to be getting better.

19. Claimant did the close down for the end of the school year.

20. On May 21, 2018, [] Claimant sent an email indicating [that] things were getting worse.

7

21. [Ms. Jenkins] advised [] Claimant to speak with [Ms. Batterton] and [Mr. Rivera], directly.

22. On June, 25, 2018, [] Claimant met with [Mr. Rivera] and was upset after the conversation.

\* \* \*

24. Claimant received an email from [Ms. Batterton] advising him that he would need to work on July 3, 2018, for incoming students and the football team.

25. On June 29, 2018, [] Claimant attempted to contact [Ms. Jenkins] but was advised she was out for the week.

26. Claimant informed Ms. Hoaty that he wanted to resign and she requested that he provide a resignation in writing.

27. Claimant provided a resignation which stated, in part, "Ms. Batterton[,] I need to resign from Blinn College effective immediately."

28. Claimant was asked to complete a written Exit Interview.

29. Claimant did not list a reason for his decision to leave Blinn College on the Exit Interview.

(F.F. Nos. 2-8, 10-13, 16-22, 24-29.) The referee concluded that Claimant resigned due to working conditions. (Referee's Decision at 3.) The referee determined that Employer failed to hire an Assistant Manager, which affected the number of hours Claimant worked, but that Claimant worked the entire year without an Assistant Manager, and thus, Claimant's working conditions had not changed by the time that he resigned. *Id*. The referee credited Employer's testimony that Claimant did not provide Employer with medical documentation with regard to his health issues. *Id*. Further, the referee explained that the last incident on July 3 caused Claimant to end

his employment voluntarily. *Id.* Finally, the referee concluded that Claimant did not provide a specific reason for his separation in his resignation nor did he speak to Ms. Jenkins before he resigned. (Referee's Decision at 4.) Thus, the referee determined that Claimant did not establish a necessitous and compelling reason for quitting, act with ordinary common sense, or make a good faith effort to preserve his employment. *Id.*

Claimant subsequently appealed to the Board. (C.R. at Item No. 11.) The Board incorporated by reference the referee's findings and conclusions. *Id.* The Board affirmed the referee's decision, finding that Claimant quit once he was informed he had to work on July 3, 2018, and that Claimant failed to request any accommodation paperwork to use the golf cart for his medical condition. (C.R. at Item No. 14.) Based on this, the Board found that Claimant failed to establish a necessitous and compelling reason to voluntarily quit his employment. *Id.* Moreover, the Board rejected Claimant's argument that he had a necessitous and compelling reason due to a substantial and unilateral change in his employment because Claimant worked the entire school year without the Assistant Manager, and thus, there was no change in employment causing him to voluntarily resign. Claimant now petitions this Court for review.

**Discussion**

On appeal,[3] Claimant purports to raise numerous issues. However, in essence, the sole question before this Court is whether Claimant has successfully

_____

[3] Our scope of review is limited to determining whether constitutional rights were violated, whether the adjudication is in accordance with the law, and whether findings of fact are supported by substantial evidence. *Ellis v. Unemployment Compensation Board of Review*, 59 A.3d 1159, 1162 n.2 (Pa. Cmwlth. 2013). "[S]ubstantial evidence is such relevant evidence as a reasonable **(Footnote continued on next page…)**

9

proven that he had a necessitous and compelling reason to voluntarily terminate his employment. At issue, specifically, is whether Claimant satisfied elements one, three, and four of the *Brunswick Hotel* test for demonstrating that he had a necessitous and compelling reason for ending his employment. The *Brunswick Hotel* test provides as follows: "(1) circumstances existed which produced real and substantial pressure to terminate employment; (2) such circumstances would compel a reasonable person to act in the same manner; (3) the claimant acted with ordinary common sense; and (4) the claimant made a reasonable effort to preserve [his] employment." *Brunswick Hotel & Conference Center, LLC v. Unemployment Compensation Board of Review*, 906 A.2d 657, 660 (Pa. Cmwlth. 2006). In support of his position, Claimant argues that there was a substantial and unilateral change to his employment agreement, that Claimant was unaware of the unsuitable working conditions when he started the job, that Employer deceived Claimant as to the conditions of his employment, and that Claimant acted with common sense and made reasonable efforts to preserve his employment. He also argues that his medical condition constituted a necessitous and compelling reason to quit.

Claimant explains that he agreed to work full-time Monday through Friday from 8:00 a.m. to 5:00 p.m. He argues that he was told before he was hired that he would have help from an Assistant Manager who would work Sunday through Thursday from 3:00 p.m. until 12:00 a.m. Claimant argues that the Assistant Manager was never hired, and he was therefore required to work over 70 hours a

**(continued…)**

mind might accept as adequate to support a conclusion." *Chartiers Community Mental Health and Retardation Center v. Unemployment Compensation Board of Review*, 134 A.3d 1165, 1170 (Pa. Cmwlth. 2016).

10

week including weekends. Claimant maintains that the failure to hire an Assistant Manager and the excess workload constituted a substantial unilateral change in his employment. Claimant also argues that the working conditions caused him to experience problems with his health.[4]

Claimant argues that where an employee is unaware of unsuitable working conditions upon hire, good cause to terminate employment exists. Claimant maintains that he had a necessitous and compelling reason to quit because he was unaware of the conditions of his employment when he accepted the job. Specifically, although he was told an Assistant Manager would be hired to assist him in his

[4] Initially, we resolve whether Claimant's alleged medical problems constituted a necessitous and compelling reason to quit. With regard to medical conditions, we have stated:

> In general, a medical condition that limits an employee's ability to perform work duties can provide a necessitous and compelling reason to quit one's employment. *Genetin v. Unemployment Compensation Board of Review*, [] 451 A.2d 1353, 1355 ([Pa.] 1982). In such situations, the employee is obliged to communicate his or her medical problem to the employer, but is not required to attempt "to initiate or effectuate the transfer to more suitable work." *Id*. at 1356. Thus, to establish that a medical condition is a necessitous and compelling reason for the voluntary termination of one's employment, a claimant must: (1) establish, through competent evidence, the existence of a medical condition; (2) inform the employer of the condition; and (3) be able and available to work if a reasonable accommodation can be made. *Id*.

*St. Clair Hospital v. Unemployment Compensation Board of Review*, 154 A.3d 401, 405 (Pa. Cmwlth. 2017). In finding Employer's testimony more credible, the Board found that Claimant did not communicate his medical condition to the employer. On appeal, we are precluded from disturbing this finding. *See Cambria County Transit Authority ("CamTran") v. Unemployment Compensation Board of Review*, 201 A.3d 941, 947 (Pa. Cmwlth. 2019). Thus, we are left to review the other circumstances that Claimant alleges constituted a necessitous and compelling reason to quit.

responsibilities, he was not given the help nor working the hours he was promised. Relatedly, Claimant argues that because he was told an Assistant Manager would be hired, and one was never hired, Employer deceived him as to the basic conditions of his employment.

Finally, Claimant argues he used common sense and took reasonable efforts to preserve his employment by repeatedly complaining about his working conditions and discussing his employment problems with his supervisors. He argues that throughout the eight-month time period he made an acceptable effort to preserve his employment because he lodged a continual protest against his working conditions.

In response, the Board argues that there was no evidence that a substantial and unilateral change to Claimant's employment agreement occurred because, for the entire time Claimant was employed, he did not work with an Assistant Manager. Moreover, the Board argues that Claimant did not take reasonable steps to preserve his employment because he did not speak with Ms. Jenkins, or the vice chancellor, before he resigned. Lastly, the Board argues that Claimant did not prove that his efforts would have been futile in bringing further complaints to Employer.

**Terminating Employment for Necessitous and Compelling Reasons**

We begin with a brief overview of the general principles of what constitutes a necessitous and compelling reason for terminating one's employment under the Law. Section 402(b) of the Law provides that an employee shall be ineligible for unemployment compensation benefits for any week in which he or she voluntarily left his or her employment without a necessitous and compelling reason. 43 P.S. §802(b). "Whether an employee has a necessitous and compelling reason to

12

voluntarily quit employment is a question of law fully reviewable by this Court." *Brunswick Hotel*, 906 A.2d at 661. A claimant who voluntarily terminates his or her employment bears the burden of proving that a necessitous and compelling cause existed. *Petrill v. Unemployment Compensation Board of Review*, 883 A.2d 714, 716 (Pa. Cmwlth. 2005).

As noted, an employee who claims to have left employment for a necessitous and compelling reason must prove that "(1) circumstances existed which produced real and substantial pressure to terminate employment; (2) such circumstances would compel a reasonable person to act in the same manner; (3) the claimant acted with ordinary common sense; and (4) the claimant made a reasonable effort to preserve her employment." *Brunswick Hotel*, 906 A.2d at 660.

### A. Whether Circumstances Existed which Produced a Real and Substantial Pressure to Terminate Employment

Our jurisprudence requires a claimant to show that circumstances existed which produced real and substantial pressure to terminate employment. *Id*. "The circumstances producing pressure to leave must be *both* real and substantial." *Philadelphia Housing Authority v. Unemployment Compensation Board of Review*, 29 A.3d 99, 101-02 (Pa. Cmwlth. 2011) (emphasis in original) (citing *PECO Energy Company v. Unemployment Compensation Board of Review,* 682 A.2d 49, 51 n.1 (Pa. Cmwlth. 1996)). "It is well-settled that an employer's imposition of a substantial unilateral change in the terms of employment constitutes a necessitous and compelling cause for an employee to terminate h[is] employment." *Morgan v. Unemployment Compensation Board of Review*, 108 A.3d 181, 187-88 (Pa. Cmwlth. 2015) (citing *A–Positive Electric v. Unemployment Compensation Board of Review,* 654 A.2d 299, 302 (Pa. Cmwlth. 1995)). Whether a change is "so substantial as to

13

warrant necessitous cause for terminating employment" must be determined on a case by case basis. *Brunswick Hotel*, 906 A.2d at 660. "[S]ubstantiality is measured by the impact on the employee, and whether the change involves any real 'difference' in employment conditions." *McCarthy v. Unemployment Compensation Board of Review*, 829 A.2d 1266, 1272 (Pa. Cmwlth. 2003). Our law is clear that "*[m]ere dissatisfaction with one's working conditions does not constitute cause of a necessitous and compelling nature for terminating one's employment.*" *Mazur v. Unemployment Compensation Board of Review*, 193 A.3d 1132, 1135-36 (Pa. Cmwlth. 2018) (emphasis in original) (quoting *Brunswick Hotel,* 906 A.2d at 660).

The facts of this case demonstrate a substantial and unilateral change in the terms of Claimant's employment that placed a real and substantial pressure on him to voluntarily terminate his employment, thus, satisfying the first element of the *Brunswick Hotel* test. The agreed terms of employment between Claimant and Employer clearly stated that Claimant was to work Monday to Friday from 8 a.m. to 5 p.m., with the help of an Assistant Manager. (F.F. No. 1.) However, Employer did not hire an Assistant Manager. (F.F. No. 5.) The Assistant Manager was supposed to be hired to help Claimant with excess workloads, maintenance requests, weekly meetings, and staff management; however, because an Assistant Manager was never hired, Claimant was left to perform all of the responsibilities alone. Claimant was left to manage 7 buildings, 338 rooms, and 338 students without the help of an Assistant Manager. (F.F. Nos. 3-5.) Specifically, Claimant was responsible for managing student check-ins and check-outs, responding to routine and emergency situations within the building and between students, preparing reports, and managing the buildings generally. (N.T. at 11; F.F. Nos. 6, 8.) These working conditions persisted for the entire duration of Claimant's employment. Claimant was required to work 70-

14

80 hours a week, nearly double the time he was hired to work. Being required to work nearly double the hours Claimant was hired to work, without assistance Employer promised him, is a substantial and unilateral change in employment conditions which occurred after he accepted the job. This case is not one of mere dissatisfaction with working conditions, but demonstrates a meaningful departure from the stated terms of employment.[5]

We find our decision in *Lewis v. Unemployment Compensation Board of Review* (Pa. Cmwlth., No. 2065 C.D. 2011, filed October 1, 2012) (unreported) to be both persuasive and instructive.[6] In *Lewis*, the claimant worked as a social services director for a nursing home. Slip op. at 1. The claimant explained that she performed four different roles (admissions coordinator, social worker, discharge planner, and case manager), which were typically filled by two or three different employees. *Id*. at 2. The claimant had worked with a part-time assistant, but for financial reasons, her assistant was terminated. *Id*. An assistant was not rehired and the claimant assumed the workload of her previous assistant, which increased her responsibilities. *Id*. The claimant repeatedly advised her employer about the overwhelming conditions she faced because of the increased responsibilities. *Id*. The employer did not provide the claimant with the assistance that she requested and, therefore, she resigned. *Id*. The claimant believed that she did not receive adequate assistance. *Id*. at 5. The Board denied the claimant benefits. *Id*. at 3. We concluded that the record reflected more than "mere dissatisfaction with working conditions," and that the claimant's

---

[5] As detailed below, Claimant brought these concerns to Employer on numerous occasions and was not offered any relief.

[6] *Lewis* is an unreported opinion. Under section 414(a) of this Court's Internal Operating Procedures, an unreported opinion may be cited for its persuasive value. 210 Pa. Code §69.414(a).

15

increased workload was a substantial and unilateral change in her employment conditions. *Id*. at 6.

This Court's decision in *Broadus v. Unemployment Compensation Board of Review*, 544 A.2d 1098 (Pa. Cmwlth. 1988) also provides guidance. There, the claimant was employed at a personal care home, where she worked with a full-time supervisor during the day. *Id*. at 1099. Subsequently, the claimant's supervisor was discharged and the claimant was also asked to perform the supervisor's duties until a new supervisor was hired. *Id*. Claimant was dissatisfied with her increased responsibilities and, specifically, having to do the work of two people. *Id*. After two weeks, the claimant asked why a replacement had not been hired. *Id*. at 1100. Because of her dissatisfaction and because a full-time day supervisor was not hired, the claimant resigned. *Id*. We concluded that the claimant experienced a substantial unilateral change in her employment conditions because she was required to run the personal care home by herself. *Id*.

The instant matter is similar to *Lewis*. Like the claimant in *Lewis*, Claimant faced a dramatically increased workload because of a lack of assistance. Because the Assistant Manager was never hired, Claimant was required to perform all of the duties alone, which resulted in him working nearly double the hours he was hired to work. Similar to *Lewis*, Claimant requested help and asked when the Assistant Manager would be hired. Like the claimant in *Lewis*, Claimant *repeatedly* advised Employer of the overwhelming conditions. Claimant brought his complaints to Ms. Batterton, Mr. Rivera, and Ms. Jenkins on numerous occasions. However, as in *Lewis*, Employer ignored Claimant's requests for help and refused to provide assistance. Thus, like *Lewis*, we conclude, here, that the dramatic increase in

16

Claimant's workload, caused by a lack of assistance, constituted a substantial change in his employment and caused a real and substantial pressure to end his employment.

Moreover, like the claimant in *Broadus*, Claimant informed Employer of his dissatisfaction with his working conditions and asked when a replacement would be hired. The claimant in *Broadus* waited approximately two months before resigning because of the unsatisfactory working conditions, while Claimant, over the course of eight months, continually asked and attempted to improve his situation. Thus, *Broadus* supports the conclusion that, because Claimant worked without assistance for eight months and was overwhelmed by the magnitude of his responsibilities, he was justified in terminating his employment.

The Board also concluded that there could not have been a substantial unilateral change in Claimant's employment situation because he worked under the same conditions for the entirety of his employment. We disagree.

Once an employee has accepted the terms of employment, it is assumed that the conditions of employment are acceptable. *Speck v. Unemployment Compensation Board of Review*, 680 A.2d 27, 30 (Pa. Cmwlth. 1996). "[An] [e]mployee may not later assert that dissatisfaction with those terms constitutes a necessitous and compelling reason, unless there has been a change in the employment conditions[,] the employee was deceived by the employer[,] or the employee was reasonably unaware of the unsuitable conditions when he accepted the position." *Id.* However, the claim of being deceived or being unaware of employment conditions can only go so far; "once an employee has accepted new employment terms, he has admitted to their suitability[], and therefore any later dissatisfaction with those terms,[]would not constitute cause of a necessitous and

17

compelling nature." *Romao v. Unemployment Compensation Board of Review*, 443 A.2d 1217, 1218 (Pa. Cmwlth. 1982) (citations omitted).

Here, when Claimant accepted his position he was unaware of the unsuitable conditions of his employment because he was specifically told by Employer, before he was hired, and throughout most of his employment that he would receive assistance from an Assistant Manager. However, an Assistant Manager was never hired. Clearly, these were not the working conditions to which Claimant had initially agreed. Moreover, the findings of fact demonstrate that, throughout the duration of his employment, Claimant lodged a continual protest as to his working conditions. Thus, there was a substantial unilateral change to the employment agreement by Employer which Claimant did not accept, as evidenced by his continual complaints about his working conditions. Based on the foregoing, we conclude that circumstances existed which produced real and substantial pressure to terminate employment.

### B. Whether Claimant acted with Ordinary Common Sense and Made a Reasonable Effort to Preserve his Employment

Because we conclude that Claimant has satisfied element one of the *Brunswick Hotel* test, we turn to whether Claimant has met elements three and four. Elements three and four of the *Brunswick Hotel* test require Claimant to prove that he (a) acted with ordinary common sense, and (b) made a reasonable effort to preserve his employment.[7]

---

[7] The second element of the *Brunswick Hotel* test, which requires a claimant to prove that the circumstances which created a substantial and real pressure to terminate his employment would compel a reasonable person to act in the same manner, is unaddressed by either party. However, to the extent analysis is necessary, we conclude that a reasonable person would have felt compelled to act in the same manner.

"Claimants have the duty to take all necessary and reasonable steps to preserve employment." *Anchor Darling Valve Co. v. Unemployment Compensation Board of Review*, 598 A.2d 647, 649 (Pa. Cmwlth. 1991). A claimant bears the burden of proving that he took all necessary and reasonable steps to preserve the employment relationship. *PECO Energy Co. v. Unemployment Compensation Board of Review*, 682 A.2d 58, 61 (Pa. Cmwlth. 1996). A claimant must communicate the offending conduct to his employer prior to voluntarily quitting. *Moskovitz v. Unemployment Compensation Board of Review*, 635 A.2d 723, 724 (Pa. Cmwlth. 1993). "If the employer promises to take action to alleviate the problem, good faith requires that the employee continue working until or unless the employer's action proves ineffectual." *Craighead-Jenkins v. Unemployment Compensation Board of Review*, 796 A.2d 1031, 1034 (Pa. Cmwlth. 2002) (citing *Donaldson v. Unemployment Compensation Board of Review*, 434 A.2d 912 (Pa. Cmwlth. 1981)). When offered a possible solution to the necessitous and compelling condition, a claimant may not speculate that the proposed change is unsuitable; he must give the arrangement a chance in an attempt to preserve his employment. *Monaco v. Unemployment Compensation Board of Review*, 565 A.2d 127, 131 (Pa. 1989) (denying benefits where two employees speculated that their new pay structure would be unsatisfactory but did not give the new pay structure a chance before terminating their employment). Failing to attempt an employer's new proposed arrangement to alleviate the necessitous and compelling condition will not support a finding that the employer's modifications were unreasonable. *Unangst v. Unemployment Compensation Board of Review*, 690 A.2d 1305, 1308 (Pa. Cmwlth. 1997) (holding that a claimant did not prove the job modifications were unreasonable and rose to the level that would compel a reasonable person to terminate her employment where she

19

did not attempt the new position offered to her and merely speculated that her workload would be increased). We conclude, here, that based on the facts that the Board found to be credible, Claimant met his burden of proving that he acted with ordinary common sense and made reasonable efforts to preserve his employment.

As explained above, Claimant was faced with real and substantial pressure to terminate his employment. In the face of this pressure, Claimant took the following steps to preserve his employment. Claimant asked his supervisor, Ms. Batterton, when the Assistant Manager would be hired. (F.F. No. 5.) Claimant asked Ms. Batterton for help, but she advised him that he did not need any help. (F.F. No. 7.) Claimant told Ms. Jenkins on April 18, 2018, that he felt misled regarding the Assistant Manager position and that he was not getting support from Mr. Rivera. (F.F. No. 16.) Ms. Jenkins later spoke with Ms. Batterton and Mr. Rivera regarding Claimant. (F.F. No. 17.) A few weeks later, on May 3, 2018, Claimant and Ms. Jenkins met in her office, and at that time Claimant indicated that things appeared to be getting better. (F.F. No. 18.) However, on May 21, 2018, Claimant sent an email indicating that his situation had worsened. (F.F. No. 20.) Ms. Jenkins then advised Claimant to speak with Ms. Batterton and Mr. Rivera directly. (F.F. No. 21.) On June 25, 2018, Claimant spoke with Mr. Rivera and was upset after the conversation. (F.F. No. 22.) Claimant received an email from Ms. Batterton advising him that he would need to work on July 3, 2018. (F.F. No. 24.) On June 29, 2018, Claimant attempted to contact Ms. Jenkins, but was unsuccessful as she was out for the week. (F.F. No. 25.) Claimant informed Ms. Hoaty that he wanted to resign, and she requested that he put his resignation in writing. (F.F. No. 26.) Claimant resigned in writing. (F.F. at No. 27.) Thus, we accept, as we must, that these are all facts found by the Board to be credible.

20

Over the course of Claimant's employment, Employer failed to alleviate the issues that Claimant raised regarding his working conditions. Claimant reached out to his supervisors and human resources personnel on numerous occasions in an attempt to preserve his employment. Yet, instead of being helped, Claimant was told that he did not need help, and his conditions did not improve. These facts illustrate that Claimant acted with ordinary common sense and acted reasonably in preserving his employment; the Board's conclusion to the contrary is not in accordance with the law.

Our disposition in *Brunswick Hotel* is similar to the instant matter. In *Brunswick Hotel*, the claimant was employed as a comptroller. 906 A.2d at 659. The business changed hands, and the new employer informed the claimant that it would make health insurance benefits available and her employment would remain the same. *Id*. Prior to the change of ownership, the claimant was provided with a total benefit package completely funded by the employer. *Id*. The claimant continually asked about her health insurance benefits. *Id*. However, the employer did not provide health insurance, and the claimant voluntarily ended her employment because of the continued lack of health benefits. *Id*. at 660. The claimant worked for eight months without health insurance. *Id*. at 663. This Court concluded that the Board correctly determined that claimant made a reasonable effort to preserve her employment by waiting eight months to receive health benefits. *Id*. at 662.

Our decision in *Mauro v. Unemployment Compensation Board of Review*, 751 A.2d 276, 278 (Pa. Cmwlth. 2000) also provides guidance. In *Mauro*, the claimant worked as a carpenter/foreman. *Id*. At his job interview the claimant told his employer, in essence, that he was a single parent with a child who was at daycare during the day, and thus, his work schedule needed to coincide with his

21

daughter's daycare schedule. *Id*. Furthermore, the claimant told the employer that he could work at one location, but not "all over." *Id*. However, only a few days into the claimant's employment, the employer required him to work longer hours at different locations. *Id*. Before he quit, the claimant asked his employer if "something [] could be worked out" between him and the employer because of his daughter's daycare schedule. *Id*. The Board denied the claimant benefits because the claimant did not request a specific change in his work hours when he quit. *Id*. at 279. This Court concluded that the Board erred, and reversed its decision. *Id*. We explained that, based on the facts as found by the Board, the claimant had taken reasonable steps to preserve his employment when he asked if something could be worked out between him and his employer. *Id*.

Here, over the course of eight months, Claimant was even more diligent than the employee in *Brunswick Hotel* in attempting to preserve his employment. The findings of fact in this case illustrate a more detailed exchange between Claimant and Employer than the employee in *Brunswick Hotel* and her employer. Instead of sitting idly for eight months and merely asking questions as to when he would receive a benefit, Claimant actively participated in improving his situation by speaking with his supervisors and seeking assistance from human resources personnel on multiple occasions.[8] Moreover, Claimant's effort to preserve his employment was greater than the claimant in *Mauro*. The claimant in *Mauro* attempted to resolve the situation with his employer a *single* time, whereas, Claimant attempted *numerous* times to remedy the problem situation. Thus, we conclude that the Board's decision is not in

---

[8] This decision should not be construed as prescribing a requirement that a claimant make a specific number of attempts to speak with his or her superiors to preserve his or her employment.

22

accordance with the law, because Claimant acted with common sense and reason in attempting to preserve his employment situation.

The Board also argues that, although Claimant had concerns about his job, he did not express his continued concerns to Ms. Jenkins or to the vice chancellor of his department. Moreover, the Board argues that Claimant did not prove that speaking to these individuals would have been futile because, when Claimant spoke with them before, his situation improved, albeit briefly. We disagree.

Although common sense and reasonable effort include informing a supervisor or other management of dissatisfaction, *Moskovitz*, 635 A.2d at 724, a claimant may be excused from reporting problematic work conditions if he or she reasonably believed that reporting would have been futile. *Martin v. Unemployment Compensation Board of Review*, 749 A.2d 541, 544 (Pa. Cmwlth. 2000); *see also Devon Preparatory School v. Unemployment Compensation Board of Review* (Pa. Cmwlth., No. 1298 C.D. 2018, filed July 15, 2019) (unreported) slip op. at 9; *Serrano v. Unemployment Compensation Board of Review*, 149 A.3d 435, 440 (Pa. Cmwlth. 2016).[9] We disagree with the Board's argument, and conclude that it would have been futile for Claimant to bring his concerns to the vice chancellor or Ms. Jenkins. As the credited facts demonstrate, Claimant complained on numerous occasions over an eight-month period to his direct supervisors and nothing changed. When he

---

[9] *Mauro* is also instructive on the point of futility. In *Mauro*, when the claimant asked if anything could be worked out between him, employer, and his daughter's daycare, he was told that "you got to do what you got do to" by his employer. *Mauro*, 751 A.2d at 279. We concluded that this statement supported the conclusion that the claimant's efforts in pursuing the matter further would have been futile. *Id*. This supports our conclusion on futility because Claimant spoke to Employer *numerous* times, and received no help, whereas, the claimant in *Mauro* only spoke to his employer once. Moreover, Claimant was told that he had better "work [his] butt off or this is not the right job for [him]." (N.T. at 22; F.F. No. 22.)

complained to Ms. Jenkins, his situation improved only temporarily, but then worsened soon after. He again complained to his direct supervisors, and again, nothing changed. Given Employer's past failure to remedy Claimant's complaints, another complaint would have been a futile exercise, the Board's argument to the contrary is incorrect as a matter of law.[10]

## Conclusion

Claimant has satisfied the *Brunswick Hotel* test. Summarily, Claimant has shown that there was real and substantial pressure to voluntarily terminate his employment because of the drastically increased workload and that he acted with ordinary common sense and reason in attempting to preserve his employment.

Accordingly, the order of the Board, dated January 8, 2019, is reversed.

_____
PATRICIA A. McCULLOUGH, Judge

---

[10] The Board argues that under *Keller v. Unemployment Compensation Board of Review* (Pa. Cmwlth., Nos. 790 & 791 C.D. 2016, filed March 29, 2017) (unreported), the failure to inform an employer that its efforts at improving a work situation have been ineffectual are fatal to a claimant's case. Although we do not question the soundness of our decision in *Keller*, it is readily distinguishable from the present facts. *Keller* concerned a situation where the claimant complained to his employer a single time about allegedly harassing working conditions. Slip op. at 6. However, after the harassing behavior allegedly continued, the claimant did not complain to his employer again. As explained at length above, this case presents a scenario where Claimant complained to Employer on numerous occasions, and thus, it is factually distinguishable.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Daryl Yingling,                      :
           Petitioner           :
                            :   No.  127 C.D. 2019
          v.                        :
                            :
Unemployment Compensation            :
Board of Review,                     :
           Respondent           :

## *ORDER*

AND NOW, this 28th day of February, 2020, the order of the Unemployment Compensation Board of Review, dated January 8, 2019, is reversed.

_____
PATRICIA A. McCULLOUGH, Judge